Robin O. Brena, Esq.
Kevin G. Clarkson, Esq.
Matthew C. Clarkson, Esq.
Jon S. Wakeland, Esq.
Brena, Bell & Clarkson, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Telephone:    (907) 258-2000
E-Mail:        rbrena@brenalaw.com
                kclarkson@brenalaw.com
                mclarkson@brenalaw.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORDAQ ENERGY, INC., a Delaware corporation with its principal place of business in Alaska,<br><br>     Plaintiff,<br><br>  v.<br><br>PAUL L. DEVINE, a Citizen of the United Kingdom and a Resident of London, England, or the State of Illinois,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 3:16-cv-_____<br>)<br>) |

## **COMPLAINT**

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Plaintiff, NordAq Energy, Inc. ("NordAq" or "the Company"), by and through its attorneys, Brena, Bell & Clarkson, P.C., for its Complaint against Defendant Paul L. Devine ("Devine"), states and alleges as follows:

## PARTIES

1.  Plaintiff, NordAq Energy, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Anchorage, Alaska. NordAq is in all ways qualified to maintain this action.

2.  Defendant, Paul L. Devine, is a citizen of the United Kingdom, who was at all times pertinent to the allegations stated in this Complaint a legal resident of the United States working and residing in the State of Alaska, but who is currently a permanent resident of either London, England, or St. Charles, Illinois. Devine is subject to the jurisdiction of this Court.

## JURISDICTION/VENUE

3.  This Court has jursidiction over the subject matter of this action based upon diversity of citizenship between NordAq and Devine under 28 U.S.C. § 1332(a)(1) and/or 28 U.S.C. § 1332(a)(2). NordAq, as a corporation organized under the laws of the State of Delaware, with its principal place of business in Alaska, is a resident of both Delaware and Alaska. Devine is a citizen of the United Kingdom, and thus is a citizen or subject of a foreign state for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a)(2). To the extent that Devine is a resident of the State of Illinois, he is a citizen of Illinois for purposes

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

of diversity jurisdiction under 28 U.S.C. § 1332(a)(1). The amount in controversy between NordAq and the Defendant is in excess of $75,000.

4. Venue in this action is appropriate in the District of Alaska under 28 U.S.C. § 1391(b)(2).

## ALLEGATIONS COMMON TO ALL COUNTS

5. Defendant Devine served as Chief Financial Officer ("CFO") of NordAq from January 2011 to August 2013 and as Chief Executive Officer ("CEO") of NordAq from September 2013 to July 2015. Devine served as a member of NordAq's Board of Directors from April 2011 to June 2015. As CFO/CEO and a member of the Board of Directors of NordAq, Devine had influence over other NordAq Board members and also members of NordAq management, which he used to execute and conceal his schemes and activities as set forth in this action.

## I. DEVINE'S MISAPPROPRIATION AND MISUSE OF CORPORATE ASSETS, OPPORTUNITIES AND FUNDS FOR PERSONAL GAIN, AND OVERALL SCHEME TO DEFRAUD NORDAQ

### A. SUMMARY OF MISAPPROPRIATIONS, MISCONDUCT AND SCHEMES TO DEFRAUD NORDAQ

6. Over the course of 2011 to 2015, Devine, acting alone or in certain instances in concert with other parties, misappropriated more than $6,500,000 in cash from, and engaged in the unauthorized and fraudulent conveyance or transfer of substantial non-cash assets of, NordAq through a wide-ranging fraud using various methods and schemes. In addition, Devine breached his fiduciary duties to NordAq in multiple ways. Certain of

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Devine's methods and means of breaching his fiduciary duties and defrauding NordAq are summarized in paragraphs 6.1 through 6.5 below.

6.1.    From 2011 to 2015, Devine engaged in an extensive and frequent pattern of direct theft of substantial sums of cash from NordAq bank accounts.

6.2.    From 2011 to 2015, Devine made unauthorized use of NordAq monies and/or Company shares and/or warrants to pay third parties with the express or implicit understanding and agreement that those third parties would transfer, convey, and/or provide, or had already transferred, conveyed, or provided, personal benefit and/or gain to Devine.

6.3.    The Devine third-party payments using NordAq's monies or assets to promote Devine's personal interests and personal business opportunities included, among other things, unauthorized and fraudulent payments of NordAq monies to Mr. Johnathon Edward Aitken Kidd ("Kidd") and Kidd's friends and relatives. Kidd was founder and Chairman of the Board for NordAq from January 2009 to June 2015, and served as consultant to NordAq from January 2011 to June 2015.  Devine has a long-time personal relationship with Kidd and his family.

6.4.    The Devine third-party payments using NordAq's monies or assets, included, among other things, unauthorized and fraudulent agreements entered into with, the conveyance of NordAq assets to, and the unauthorized issuance of warrants to purchase equity securities of NordAq to, Lothian Investment Partners Limited ("Lothian") and Andrew Allister Knott ("Knott") and Knott's wife and business partners.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

6.5.    The Devine third-party payments using NordAq's monies or assets to promote Devine's personal interests and personal business opportunities included, among other things, the theft and unauthorized and fraudulent payment of enormous sums of NordAq monies to and for the benefit of more than fifty of Devine's friends and relatives, by purchasing homes for them, paying for their personal vacations, paying for their college tuition, and paying many of their personal expenses.

7.    Devine's breaches of fiduciary duty, misappropriations, and actions to defraud NordAq also included, among other things, the activities summarized in paragraphs 7.1 through 7.8 below.

7.1.    Devine executed, on behalf of the Company, a consulting contract or agreement with Kidd through a company named Clearview Management, Inc. ("Clearview").  Clearview is a company controlled and owned by Devine.  He then caused NordAq to pay sums of money for Kidd's services far in excess of the contracted terms directly to Devine's personal bank account.  However, on information and belief, Devine did not remit to Kidd all of the funds that he received from NordAq related to Kidd's services.  In this way, Devine used the consulting agreement with Clearview for Kidd's consulting services to disguise and hide payments of monies from NordAq to himself.

7.2.    Although Devine was paid a salary through NordAq's payroll beginning in January 2012, he instructed NordAq finance personnel to wire into his personal bank account substantial sums of NordAq monies on a frequent but ad hoc basis ($5,287,000 from nearly 200 wire transfers from 2011-2015), as and when he desired such

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

funds. Additionally, Devine personally collected NordAq monies approved for the payment of Kidd's consulting services to NordAq. Devine also charged substantial personal expenses on NordAq debit cards, without the knowledge or approval of the Company's Board of Directors or shareholders. Devine caused NordAq to maintain a "Due from Clearview" account in an attempt to reconcile the amount owed from Devine on a monthly basis; however, the convoluted way that Devine managed the Company's cash and the difficulty in getting proper documents approving various transactions made this reconciliation difficult and enabled Devine to take, or caused to be expended for his benefit, significantly more NordAq monies that he was actually due in compensation.

7.3. Devine presented false invoices from third parties for services never performed for the benefit of NordAq that resulted in the payment of substantial sums of monies from NordAq to Devine's friends and family.

7.4. Devine fabricated or had others create purported NordAq Board documents appearing to represent evidence of NordAq's Board's approval of various bonuses for himself and Kidd, among other things, when in fact these issues were never presented to, or approved by, the NordAq Board. In many cases, purported NordAq Board minutes or resolutions were created a year or more after the supposed meetings took place, and were created only after NordAq's auditors requested evidence that appropriate approvals had been given for certain transactions. In these cases, Devine was creating false audit evidence for the purpose of obtaining an unqualified audit opinion—one that would have been based upon false and fraudulent information.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Complaint                                                          November 18, 2016
*NordAq Energy v. Paul L. Devine*                                   Page 6 of 27

7.5.   In several cases, Devine communicated with members of the Company's accounting staff, including by email, and instructed them to record as NordAq expenses payments from NordAq, which benefitted Devine or his friends and family and that provided no benefit whatsoever to NordAq.

7.6.   Devine orchestrated the transfer of significant overriding royalty interests ("ORRIs") in the Company's leased acreage in Alaska to himself and other Company executives, without Board approval, and then transferred, and had the other executives transfer, these ORRIs to other parties, on information and belief, in return for payments directly to Devine.

7.7.   Devine sold a significant portion of his shares in NordAq, in violation of his fiduciary duties as the CEO and as a Board member of the Company, at many times when the Company was actively raising funds for its operations.  In doing so, he created a private market for shares to benefit only himself, and deprived the Company of potential investors that it was actively pursuing to finance Company projects.

7.8.   In 2011, NordAq did not have a payroll; all employees were paid as consultants.  Devine was paid during this time from a Chase account by a NordAq Director who was residing in the United Kingdom.  Devine never informed this NordAq Director that Devine was being paid through NordAq's payroll starting in January 2012, and Devine continued to receive his consultant pay, in addition to his salary, for over two years.  As CFO of the Company during this time, Devine was in charge of the financials of the Company, and therefore the issue of Devine's compensation; more specifically, his over-

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska  99501
Phone:  (907) 258-2000
Facsimile:  (907) 258-2001

compensation was never raised to the attention of NordAq's Board of Directors or shareholders.

## B. SPECIFIC MISAPPROPRIATIONS, MISCONDUCT AND SCHEMES TO DEFRAUD NORDAQ

8. Between 2011 and 2015, Devine was paid an annual salary of $300,000; however, in addition to the $1,330,443 that he received via the NordAq payroll (over $50,000 of which constituted a bonus that was not properly approved by the Board), Devine paid himself or caused NordAq employees to pay him the following extraordinary sums of NordAq monies: $4,597,545 in Wells Fargo wire transfers, $689,000 in Chase wire transfers, $413,577 in expenses for himself or Kidd paid on company debit cards, and $10,574 for his personal American Express credit card account. In addition, Devine authorized over $500,000 in fringe benefits for himself and Kidd that were not approved by the NordAq Board or documented in any agreement. Devine also authorized, and in many cases disguised as NordAq expenses, over $1,300,000 in payments to third parties that benefitted Devine and his friends and family, but that provided no value to NordAq. Additionally, Devine used Company debit cards to purchase over $265,000 of airline tickets for over fifty of his friends and acquaintances who had no connection to NordAq. The total payments to Devine and for the sole benefit of Devine and his friends and family between 2011 and 2015 exceeded $9,000,000. Certain of Devine's methods for misappropriation of Company monies or assets are set forth in the examples below.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Complaint
*NordAq Energy v. Paul L. Devine*

9.      On September 1, 2011, Devine instructed NordAq to wire him $148,000, purported to be used in part to make a loan of $58,000 to Faith Warthen ("Warthen"), who was the wife of a Company executive.  Devine instructed that the $58,000 be recorded as a loan receivable by NordAq from Warthen.  Later, on April 12, 2013, Warthen requested wire transfer information for NordAq to pay back the loan, but subsequently was instructed by Devine to send the funds to Devine rather than NordAq.  Devine wired NordAq $50,000 on April 19, 2013, but he did not notify NordAq that these funds related to Warthen, instead recording the transfer of funds as a reduction in the amount due from Clearview (*i.e.*, Devine).  Devine then instructed NordAq employees to cause NordAq to write the Warthen loan off as part of the Company's 2013 audit.

10.      Devine caused to be wired $1,200,000 from NordAq to his personal bank account on September 16, 2014, which he claimed represented a $600,000 bonus for Devine and a $600,000 bonus for Kidd.  These bonuses were not approved by the NordAq Board, and on information and belief, the $600,000 for Kidd was kept by Devine and not transferred to Kidd.  From this unauthorized payment, Devine immediately disbursed $1,052,714 to various parties, including $945,000 that was wired on September 16, 2014, to complete his purchase of a private residence in Driftwood, Texas, for an individual named Cheryl White (a person who was not then and is not now affiliated with NordAq in any way); $5,000 that was wired on September 16, 2014, for a cashier's check required to purchase furniture and lawn equipment on the Driftwood, Texas, property; $6,109 wired on September 17, 2014, to pay tuition for the daughter of an individual named Rebecca

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska  99501
Phone:  (907) 258-2000
Facsimile:  (907) 258-2001

Detrick (a person who was not then and who is not now affiliated with NordAq in any way); and $96,605 that was wired on September 22, 2014, to pay a confession of judgment that Devine had personally signed related to another property that he had purchased with NordAq funds, which served as the residence of Rebecca Detrick.

11.     Devine caused to be wired $350,000 from NordAq to his personal bank account on December 1, 2014, for the stated purpose of paying cash fees to an individual named Kenneth David Stevenson ("Stevenson"), who had a relationship with Devine, related to a $10 million loan that Stevenson helped arrange on behalf of the Company in October 2014 (Stevenson also received 278,750 NordAq warrants for his fundraising success on behalf of the Company and was transferred 250,000 of Kidd's shares, on information and belief, in exchange for benefits enjoyed only by Devine and not the Company).   On December 1, 2014, the same day NordAq wired Devine $350,000, purportedly for Stevenson, Devine wired $330,550 to pay for another private residence in Auburn, Alabama, that he purchased for an individual named Donna Kress (an individual who was not then and is not now affiliated with NordAq in any way).   Subsequently, Devine instructed NordAq employees to send a separate transfer of $300,000 on December 3, 2014, to an entity called EAS Advisors (for whom Stevenson was working) for the same services.  Email evidence shows that Stevenson was compensated from this $300,000 payment.

12.     Devine made $413,577 in unauthorized personal expenses that he charged directly to NordAq debit cards, including $39,897 to Auburn University to pay the tuition

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

for the daughter of Donna Kress (an individual who was not then and is not now affiliated with NordAq in any way); $9,874 to Tiffany's for a personal gift for one of his family or friends; $32,311 to a concierge/limo service in London, England, for services delivered to himself and/or one or more of his family or friends; $55,751 to AT&T for personal cell phones (belonging to himself and non-NordAq employees) separate from his NordAq cell phone; $36,311 to Hilton for personal hotel stays; $18,614 to U.S. Bank for an Audi automobile either for himself or one of his family or friends; $17,548 to Intercontinental Hotel for personal hotel stays; $14,303 to another limo service for services delivered to himself and/or one of his family or friends; and $165,795 to 122 additional separate vendors for personal expenses unrelated to NordAq business. *See* the attached Exhibit A for a detailed spreadsheet of personal expenses by vendor and category. None of the above-stated expenses were related to NordAq business or were of any benefit to NordAq.

13.     Between 2011 and 2015, Devine made or authorized payments to others for his personal benefit that were either recorded as NordAq expenses or in the "Due from Clearview" account in NordAq's books and records, totaling in excess of $1,300,000. These expenses include $84,000 to a horse-breeding company owned by Kidd's assistant/associate; $7,311 to pay the landlord of Stevenson; $3,525 and $4,578 for collectible fountain pens for Devine; $5,119 for payment on Devine's personal mortgage; $7,500 to pay Kidd's personal tour fees in Taiwan; $12,000 to pay an attorney for Devine's mother's estate; $16,088 for a golf outing for Kidd's daughter; $24,000 in support payments to Kidd's ex-wife; $33,408 to Andrew Fraser, the boyfriend of Devine's

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

daughter; $45,000 in support payments to Kidd's son; $50,000 in support payments to Kidd's daughter; $60,000 to Kidd's cousin for unspecified consulting services, on information and belief never provided to NordAq, and/or which had no value or benefit to NordAq; $69,744 for real property title searches that were of no benefit or value to NordAq; $2,974 for a credit card unrelated to NordAq; $144,470 to Swiss Finanz (of which Devine owns 49 percent); $125,000 for a debt of Devine's former employer that he personally assumed; $185,409 for a downpayment on a residence in Puyallup, Washington, which bore no relation to NordAq's business; $196,472 to pay off a personal loan of Devine; and $260,000 in escrow payments related to Devine's former employer. None of these payments were for services or goods that provided any benefit to NordAq.

14. Total payments from NordAq to Kidd's friends and family, made or authorized by Devine, totaled $263,000, but there is no evidence that any of them had any contract with NordAq or provided any services of value to NordAq. These payments include $20,000 to Lord Maxwell Beaverbrook ("Beaverbrook," Kidd's cousin) on September 12, 2012; $25,000 to Beaverbrook on December 5, 2012; $10,000 to Jack Kidd (Kidd's son) on November 12, 2013; $25,000 to Jodie Kidd (Kidd's daughter) on December 18, 2013; $25,000 to Jack Kidd on December 18, 2013; $15,000 to Beaverbrook on December 31, 2013; $25,000 to Jodie Kidd on February 14, 2014; $10,000 to Jack Kidd on February 25, 2014; $24,000 to Wendy Kidd (Kidd's ex-wife) on August 6, 2014; and $84,000 to ATSBA Canada (owned by Cynthia Swensen, Kidd's assistant/associate) in twenty-three payments from July 2013 to May 2015.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Complaint
*NordAq Energy v. Paul L. Devine*

15.     NordAq paid a total of $69,744 to Vellum LLC, authorized by Devine for title searches, including $19,375 on April 22, 2014; $14,345 on June 2, 2014; $18,250 on Feburary 25, 2015; and $17,774 on March 16, 2015.  These title searches on NordAq's lease properties were used to understand the ORRI position on these assets.  ORRIs were issued to NordAq executives, including Devine, and most were subseqently transferred to others.  Vellum's services benefitted the executives and the transferrees, not NordAq.

16.     NordAq made payments to Mr. Ernst Reutimann that Devine caused to be recorded as "Capital Raising Costs," including $50,000 on January 19, 2012; $20,000 on August 9, 2012; and $55,000 on September 18, 2014.  These payments were for a loan that Mr. Reutimann made to Perftech, Inc. ("Perftech"), Devine's former employer, which Devine had personally assumed.  These payments were of no benefit to NordAq.

17.     On October 17, 2012, NordAq wired $185,409 to National Title Company for a residence in Puyallup, Washington.  This residence was purchased in Devine's name and was the residence of an individual named Rebecca Detrick (a person who was not then and is not now affiliated with NordAq in any way).  The amount was posted to NordAq's "Due from Clearview" account and was supposed to be repaid by Devine within days, but the check Devine sent to NordAq on October 19, 2012, was rejected due to nonsufficent funds.  Devine paid $75,000 to NordAq on October 26, 2012, but the balance of $110,409 remains unpaid.  In addition, Devine signed a confession of judgment in the amount of $96,605 for work done on this property, which he paid from the $1.2 million "bonus" he received in September 2014.  In total, Devine caused NordAq to fund a net amount of

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

$207,214 for a property that was of no benefit to it and which Devine sold on February 2, 2015, for $610,000. Per the settlement statement evidencing Devine's sale of this property, Devine received $109,638 from the sale. None of these funds were returned to NordAq.

18.     NordAq made several payments to the law firm Jermain, Dunnagan & Owens ("JDO") and JDO Trust that Devine instructed NordAq's finance department via email to record as "Legal Fees," specifically: $97,000 on May 7, 2014; $50,000 on June 9, 2014; and $49,418 on July 28, 2014. JDO represented Michael Williams, who loaned $200,000 to Devine personally in September 2012 and was legally pursuing Devine for nonpayment of this loan. These payments were of no benefit to NordAq.

19.     Devine paid or caused to be paid funds to Perftech, which provided no service to NordAq. NordAq wired Devine $85,000 on January 18, 2012, and Devine sent $80,000 to Perftech on that same date. In September 2012, Eider LLC ("Eider") (a company 100 percent owned by Devine) sent Perftech $550,000, of which NordAq paid $260,000 with a wire to an escrow account related to a Perftech settlement agreement. Coincidentally, Kidd approved a bonus for Devine of $150,000, paid on August 30, 2012, which, on information and belief, was for the sole purpose of allowing Devine to send these funds to Perftech. On January 4, 2013, NordAq wired Devine $50,000, and on January 7, 2013, Eider sent $50,000 to Perftech. On May 13, 2013, NordAq wired $32,000 to Devine, and on that same day, Eider sent $25,000 to Perftech. On July 12, 2013, NordAq wired $32,000 to Devine, and on that same day, Eider sent Perftech $25,000. Between August 7 and

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

August 27, 2013, NordAq wired $84,500 to Devine, and on August 27, 2013, Eider sent Perftech $25,000.

20.     NordAq made payments to Swiss Finanz (Marcel Riedel ("Riedel")), which were recorded as "Capital Raising Costs": $12,000 on July 24, 2012; $9,000 on September 17, 2012; $15,000 on October 26, 2012; $8,000 on December 21, 2012; $7,900 on February 12, 2013; $7,400 on March 7, 2013; $7,680 on April 30, 2013; $7,750 on June 7, 2013; $7,240 on August 5, 2013; $7,500 on November 14, 2013; $15,000 on January 28, 2014; $20,000 on January 7, 2015; and $20,000 on March 26, 2015. There is no evidence that Riedel introduced any investors that purchased shares from NordAq. Moreover, Devine was a 49 percent owner in Swiss Finanz, and there is evidence that Riedel was active in seeking investors who made personal loans to Devine and were subsequently granted shares of NordAq or transferred shares of NordAq by Devine. The personal loans to Devine, including $200,000 from Urs Klingler, $100,000 from Jacquelin Kubli, and $55,000 from Swiss Finanz itself, were secured with NordAq shares and royalties from NordAq's development.

21.     Riedel and Swiss Finanz were also active in seeking investors to purchase Devine and Kidd's personal NordAq shares, with a total of 147 transfers/sales of shares by Devine and Kidd between March 2013 and May 2016. Neither management nor NordAq's Board was ever made aware of the specifics of these transactions. Riedel also found a buyer for certain of the Company's ORRI interests in May 2015, but this transaction was never discussed or authorized by the NordAq Board. Nor was the transfer of a one percent

BRENA, BELL & CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Complaint                                                                    November 18, 2016
*NordAq Energy v. Paul L. Devine*                                            Page 15 of 27

ORRI in certain NordAq lease assets to NordAq executives, including Devine and Kidd in June 2015.

22.     NordAq made payments to Andrew Fraser, boyfriend of Devine's daughter, in the amounts of $16,408 on September 8, 2014; $8,500 on December 17, 2014; and $8,500 on December 29, 2014.  The only description of services on Fraser's invoices are "Support to Chairman When in UK" or "1 Month UK Support."  Fraser provided no services to NordAq.

23.     Between 2011 and 2015, Devine made or authorized payments of fringe benefits to himself and Kidd in excess of $500,000.  NordAq was not obligated to pay any of these benefits, and these benefits were not authorized by the Board.  These personal expenses paid by NordAq include $221,691 for two apartments in London for Kidd; $107,717 for Devine's Anchorage apartment; $78,467 for Kidd's health insurance (which far exceeded the value of premiums paid by NordAq for other NordAq employees under the Company's health insurance plan); $57,130 for two Audi leases; $18,023 for personal auto insurance; $11,765 for Kidd's phone and internet in Canada; and $9,645 to Perftech for reimbursement of payments made by Perftech for Devine's personal automobile.

24.     Between 2011 and 2015, Devine made or authorized payments for personal flights for at least fifty friends and family members on NordAq debit cards in an amount exceeding $265,000.  *See* attached Exhibit B, listing personal flights paid for by NordAq.  These flights offered no benefit to NordAq.  Devine also charged flights for himself

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

exceeding $630,000, and flights for Kidd exceeding $200,000, which, upon information and belief, include personal flights of no benefit to NordAq.

25. Devine continuously transferred or sold his personal NordAq shares from March 2013 through May 2016. Under the terms of the Subscription Agreement of NordAq's largest investor, that investor was entitled to a right of first refusal on any sales of shares, and Devine and Kidd were restricted to selling or transferring a maximum of 20 percent of their personal holdings. Devine sold or transferred 232,669 shares, of which NordAq was never given any details. However, NordAq has learned that Devine transferred 38,461 shares to Rolf Ehlers on April 15, 2011, to repay a loan of $250,000, and subsequently appears to have settled interest on that loan with cash and shares, but there is no record of this transfer in NordAq's books. NordAq has also learned that Devine sold 10,000 shares to Michael Poujol ("Poujol") on May 10, 2013, which Poujol thought were newly issued shares based on Devine's representations, and another 10,000 shares to Poujol on August 25, 2013, where Devine again suggested to Poujol that he was buying new shares, not Devine's shares. Poujol was an investor willing to invest in NordAq, but Devine instead sold his own shares (for which he paid nothing) and kept the money at a time when NordAq was actively seeking to sell new shares.

26. Devine appears to have made personal investments using NordAq funds. On November 20, 2012, Devine invested approximately $48,000 in Blue Ensign Technologies Limited. NordAq wired Devine $140,000 from November 15-27, 2012. On November 4,

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Complaint
*NordAq Energy v. Paul L. Devine*

2014, Devine invested $25,000 in Drink This LLC.  This was less than two months after Devine received the $1.2 million "bonus" from NordAq documented in paragraph 10.

## II.   LOTHIAN INVESTMENT PARTNERS LIMITED and ANDREW ALLISTER KNOTT

27.    Lothian Investment Partners Limited is a corporation organized under the laws of Scotland, United Kingdom.  Andrew Allister Knott ("Knott"), a citizen of the United Kingdom residing in London, England, is the sole shareholder of Lothian.  Hereafter, when Lothian and Knott are intended to be referenced together, they will be referred to as Lothian/Knott.

28.    In 2013, Knott approached Devine (according to Devine) regarding Knott's desire to acquire certain leases for oil and gas located on the North Slope of the State of Alaska from the Bureau of Land Management, Department of the Interior ("BLM") and the State of Alaska, Department of Natural Resources ("ADNR").  The United States and the State of Alaska own land on Alaska's North Slope.  Leases for oil and gas that is located below the surface of federal and state lands on Alaska's North Slope are acquired through an application or bidding process.

29.    Lothian/Knott did not qualify to apply and/or bid for Alaska North Slope oil and gas leases.  NordAq, however, did qualify to apply and/or bid for Alaska North Slope oil and gas leases.  Knott proposed to Devine that NordAq would use its geologists, technical resources, and personnel to identify and bid on the lease prospects and use NordAq's status as a qualified bidder in the BLM/ADNR auctions, while Lothian/Knott

BRENA, BELL & CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska  99501
Phone:  (907) 258-2000
Facsimile:  (907) 258-2001

would loan funds to NordAq to make application and make the required 20 percent bid amount down payment required to bid to BLM/ADNR for identified Alaska North Slope oil and gas leases. Knott proposed to Devine that if NordAq was successful in applying and/or bidding on the Alaska North Slope oil and gas leases using the loaned funds from Lothian, then Lothian would form a new company that qualified to hold such leases and that Lothian or an affiliated company would have a call option to have the leases conveyed to the new holding company, and the loan to purchase the leases conveyed to the new holding company would be extinguished. This new holding company, upon the exercise of the call option, was to be 70 percent owned by Lothian in recognition of the fact that Lothian would have funded the purchase of the oil and gas leases and NordAq would retain 30 percent for its contribution to the identification of the lease prospects and the technical and geological support, and actual purchase of the leases in the BLM/ADNR auctions. If Lothian elected not to exercise the call option, Nordaq would retain the leases, but would return Lothian's funding via the repayment of the Lothian loan. The intention of the parties was that the newly formed company would be formed and qualified as soon as practical and the option to convey the leases from NordAq into the newly formed company would be made immediately (pursuant to the loan agreement to fund the 20 percent downpayment to bid in the auction, Lothian's call option could be exercised only within 120 days after the newly formed company had been incorporated and registered with the BLM and ADNR). As a condition of Lothian/Knott lending the funds to NordAq to make the bids on the leases for the benefit of Lothian/Knott, Knott required Devine to sign a personal

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

guarantee to secure the debt. Devine provided said guarantee, on information and belief, with the understanding that Devine would receive personal benefit from Lothian/Knott and/or from the new holding company to be formed by Lothian/Knott for the purpose of receiving the oil and gas leases. In fact, at the time that this loan was made, Devine caused Company employees to issue 200,000 options to Devine, representing approximately 3 percent of the total underlying common shares of the Company then outstanding.

30. Lothian/Knott, working with Devine, failed to form the new company into which the acquired leases were to be conveyed by NordAq prior to the date upon which the remaining 80 percent of the lease acquisition costs were required to be paid. As a result, Lothian proposed making additional loans to NordAq to cover the remaining lease acquisition costs and certain other data on Lothian's behalf pending the formation and approval of the new holding company, since the call option had not been exercised as a result of the inability to convey the leases into an approved new holding company. This was done with the understanding that the payments for lease acquisition and other costs were the obligation of Lothian, and the NordAq payments were made as an accommodation to Lothian/Knott pending the formation of the new company into which the leases were to be conveyed.

31. In violation of NordAq's Bylaws and controlling Delaware law, Devine never noticed, called, and/or held a meeting of NordAq's Board of Directors to consider and approve the proposed oil and gas lease-acquisition transaction with Lothian/Knott, any of the loan transactions, or the option issuance to Devine. Devine had NordAq's legal

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Complaint
*NordAq Energy v. Paul L. Devine*

November 18, 2016
Page 20 of 27

counsel prepare purported Minutes of a meeting of NordAq's Board of Directors, a meeting that purportedly was noticed and held on October 31, 2013, for the purpose of considering and approving the transactions. But, Devine never caused any such meeting of NordAq's Board of Directors to be noticed and/or held consistent with NordAq's Bylaws and/or controlling Delaware law. On November 1, 2013, when NordAq's legal counsel received an email communication from Lothian's/Knott's legal counsel inquiring whether the members of NordAq's Board of Directors had been given notice of the purported October 31, 2013, Board meeting, Devine wrote back to NordAq's legal counsel and falsely stated that he had given notice of the meeting "by telephone." In truth, Devine never gave notice to the NordAq Board members of any meeting in October or November 2013, including, but not limited to, any meeting related to Lothian's/Knott's proposal.

32. The oil and gas leases contemplated by Devine and Lothian/Knott were awarded to NordAq in February 2014. Subsequently, Knott assigned the call option to a company that he incorporated, called Golden Eagle Petroleum Limited ("Golden Eagle").

33. In January and February 2014, Devine caused NordAq to issue 238,750 warrants to Knott's wife and 132,916 warrants to Knott's business associates, named Azima Musayeva and Hayal Ahmadzada (collectively, the "Knott Warrants"). The Knott Warrants represented over 5 percent of the total underlying common shares of the Company then outstanding. In violation of NordAq's Bylaws and controlling Delaware law, Devine never noticed, called, and/or held a meeting of NordAq's Board of Directors to consider and approve the Knott Warrants. NordAq received no benefit from the issuance

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

of the Knott Warrants.  On information and belief, however, Devine would receive a personal benefit from Knott, Lothian, and/or Golden Eagle in consideration for the unauthorized issuances of the Knott Warrants.

34.     In July 2015, Devine resigned from his employment with NordAq.  Soon after his resignation, Devine was engaged by Golden Eagle and Lothian.

35.     On information and belief, Golden Eagle became registered with the BLM and ADNR on or about November 3, 2015.  On or about January 7, 2016, Golden Eagle issued notice to NordAq of its intention to exercise the call option.  NordAq's then-President, Robert Warthen, confirmed, by a February 10, 2016, email to Knott and Golden Eagle, that NordAq had assigned the oil and gas leases to Golden Eagle on the expectation that the agreement that Lothian loans used for lease acquisition and certain data acquisition expenses would be extinguished, as agreed upon by the parties.  Thereafter, Golden Eagle informed NordAq of its intention to transfer to NordAq 240,000 fully paid, ordinary shares in the capital of Golden Eagle.

36.     After the conveyance of the leases by Golden Eagle to Lothian, Devine and Knott devised, and are in the process of attempting to execute, a scheme to retain both the leases conveyed pursuant to the call option, as well as the payment of all of the loan amounts extended to purchase the leases (*i.e.*, Lothian's consideration under the original carry agreement), including the Lothian loans made, so that Nordaq, as a qualified purchaser in the bid round, would accommodate Golden Eagle's request that all the lease acquisition costs, among other Golden Eagle expenses, would be made prior to the

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

respective deadlines for such payments. In effect, Knott, Devine, and Lothian are seeking to achieve the fraudulent conveyance of the leases and/or the implementation of an onerous and absurd outcome where Nordaq would not only provide its agreed-upon services for Lothian and Golden Eagle, but it would also effectively finance and pay for Lothian's full 70 percent equity interest in Golden Eagle.

## CAUSES OF ACTION

## COUNT 1—CONVERSION

37.     NordAq incorporates herein the allegations stated in paragraphs 5 through 36 above.

38.     Through his actions described in detail above, including, but not limited to, (a) transferring to and/or expending and/or utilizing NordAq funds and/or property for his own, his family members', and/or his personal friends' benefits, and/or in order to induce others to provide benefit or value to Devine; (b) transferring to and/or expending and/or utilizing NordAq funds and/or property for Kidd's own, his family members' and/or Kidd's personal friends' benefits, and/or in order to induce Kidd and others to provide benefit or value to Devine; and (c) usurping valuable corporate opportunities that rightfully belonged to NordAq, Devine committed conversion(s) of NordAq's monies, tangible and intangible property, and/or corporate opportunities.

39.     As a direct and proximate result of Devine's conversion, NordAq has suffered damages, the exact amount and nature of which will be proven with particularity

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

at trial. NordAq did not discover or learn of Devine's conduct described above until September 2016.

40. Devine is liable to NordAq for its damages incurred as referenced in paragraph 39 above.

41. Devine's conduct, as described above, was willful, intentional, malicious, and outrageous, and he is therefore responsible to NordAq for punitive or exemplary damages in an amount to be determined at trial.

## COUNT 2—BREACH OF FIDUCIARY DUTY
### (Failure to Exercise Reasonable Care)

42. NordAq incorporates herein the allegations stated in paragraphs 5 through 36 above.

43. At all times pertinent to this Complaint, as an officer and Director of NordAq, Devine was a fiduciary to NordAq and owed NordAq fiduciary duties.

44. Devine's fiduciary duties to NordAq required him to possess that degree of knowledge and to exercise that degree of care that an ordinary officer and director would have possessed and exercised on behalf of NordAq under like or similar circumstances.

45. Devine's conduct, as described in paragraphs 27 through 36 above, including, but not limited to, his conduct with respect to Lothian/Knott, breached Devine's fiduciary duty of care owed to NordAq.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

46.     As a direct and proximate result of Devine's breach of his fiduciary duty of care, NordAq has suffered damages, the exact amount and nature of which will be proven with particularity at trial.

## COUNT 3—BREACH OF FIDUCIARY DUTY
### (Failure to Disclose Material Information and to Maintain Loyalty to NordAq)

47.     NordAq incorporates herein the allegations stated in paragraphs 5 through 36 above.

48.     Devine's fiduciary duties to NordAq required him to disclose to NordAq, by and through its Board of Directors, all material information affecting NordAq's rights and interests, and to maintain loyalty to NordAq and to act in NordAq's best interests without regard to his own personal interests to the extent that those interests conflicted with NordAq's interests.

49.     Devine's conduct as described in paragraphs 5 through 36 above, including, but not limited to, his conduct with respect to Lothian/Knott, breached Devine's fiduciary duty of disclosure and loyalty owed to NordAq.

50.     As a direct and proximate result of Devine's breach of his fiduciary duty of disclosure and loyalty, NordAq has suffered damages, the exact amount and nature of which will be proven with particularity at trial.

## COUNT 4—FIDUCIARY FRAUD
### (Failure to Disclose Material Information)

51.     NordAq incorporates herein the allegations stated in paragraphs 5 through 36 above.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

52.     Any failure by a fiduciary such to disclose material information to the beneficiary of the fiduciary relationship constitutes fiduciary fraud. Devine's failure as a fiduciary to disclose material information to NordAq as referenced above, including, but not limited to, information regarding Lothian/Knott, constitutes fraud.

53.     NordAq relied to its detriment upon and acted against its own best interests, as a result of Devine's failure to provide material information to NordAq.

54.     As a direct and proximate result of NordAq's detrimental reliance, NordAq has suffered damages, the exact amount and nature of which will be proven with particularity at trial.

55.     Devine's conduct, as described above, was willful, intentional, malicious, and outrageous, and he is therefore responsible to NordAq for punitive or exemplary damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, NordAq prays for a trial by jury and that judgment be entered in its favor and against Devine as follows:

1.     For consequential damages in an amount to be proven at trial, but in no event less than $6.5 million;

2.     For punitive or exemplary damages;

3.     For interest, costs, and attorneys' fees as allowed by applicable law; and

4.     For such other and further relief as the Court deems just and equitable.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

DATED this 18th day of November, 2016.

BRENA, BELL & CLARKSON, P.C.
Attorneys for Plaintiff

By_____
          Robin O. Brena, ABA No. 8410089
          Kevin G. Clarkson, ABA No. 8511149
          Matthew C. Clarkson, ABA No.1111077
          Jon S. Wakeland, ABA No. 09110660

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001