Robin O. Brena, Esq.
Kevin G. Clarkson, Esq.
Matthew C. Clarkson, Esq.
Jon S. Wakeland, Esq.
Brena, Bell & Clarkson, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Telephone:    (907) 258-2000
E-Mail:        rbrena@brenalaw.com
               kclarkson@brenalaw.com
               mclarkson@brenalaw.com
               jwakeland@brenalaw.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORDAQ ENERGY, INC., a Delaware corporation with its principal place of business in Alaska,<br><br>                  Plaintiff,<br><br>        v.<br><br>PAUL L. DEVINE, a citizen of the United Kingdom; ANDREW ALLISTER KNOTT, a citizen of the United Kingdom; LOTHIAN INVESTMENT PARTNERS LIMITED, a corporation organized under the laws of Scotland, United Kingdom, and with its principal place of business in the United Kingdom; and GOLDEN EAGLE PETROLEUM LIMITED, a corporation organized under the laws of Scotland, United Kingdom, and with its principal place of business in the United Kingdom,<br><br>                  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. 3:16-cv-0267 JWS |

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                             March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS        Page 1 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 1 of 47

## SECOND AMENDED COMPLAINT

Plaintiff, NordAq Energy, Inc. ("NordAq" or "the Company"), by and through its attorneys, Brena, Bell & Clarkson, P.C., for its Second Amended Complaint against Defendants Paul L. Devine ("Devine"), Andrew Allister Knott ("Knott"), Lothian Investment Partners, Limited ("Lothian"), and Golden Eagle Petroleum Limited ("GE") states and alleges as follows:

## PARTIES

1.      Plaintiff, NordAq Energy, Inc. ("NordAq"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Anchorage, Alaska.  NordAq is in all ways qualified to maintain this action.

2.      Defendant, Paul L. Devine ("Devine"), is a citizen of the United Kingdom, who was at all times pertinent to the allegations stated in this Complaint a legal resident of the United States working and residing in the State of Alaska, but who is currently a permanent resident of London, England.  Devine is subject to the jurisdiction of this Court.

3.      Defendant, Andrew Allister Knott ("Knott"), is a citizen of the United Kingdom and a resident of London, England.  Knott is subject to the jurisdiction of this Court.

4.      Defendant, Lothian Investment Partners Limited ("Lothian"), is a corporation organized and existing under the laws of Scotland, United Kingdom, with its principal place of business in the United Kingdom.  Lothian is subject to the jurisdiction

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 2 of 47

of this Court. Hereafter, when Knott and Lothian are referenced together, they will be referred to as Lothian/Knott.

5.       Defendant, Golden Eagle Petroleum Limited, ("GE") is a corporation organized and existing under the laws of Scotland, United Kingdom, with its principal place of business in the United Kingdom. GE is subject to the jurisdiction of this Court.

## JURISDICTION/VENUE

6.       This Court has jursidiction over the subject matter of this action based upon diversity of citizenship between NordAq and Devine under 28 U.S.C. § 1332(a)(1) and/or 28 U.S.C. § 1332(a)(2). This Court has jursidiction over the subject matter of this action based upon diversity of citizenship between NordAq and Knott under 28 U.S.C. § 1332(a)(2). This Court has jurisdiction over the subject matter of this action based upon diversity of citizenshp between NordAq and Lothian under 28 U.S.C. §§ 1332(a)(2) and 1332(c)(1). This Court has jurisdiction over the subject mater of this action based upon diversity of citizenship between NordAq and GE under 28 U.S.C. §§ 1332(a)(2) and 1332(c)(1). NordAq, as a corporation organized under the laws of the State of Delaware, with its principal place of business in Alaska, is a resident of both Delaware and Alaska. Devine is a citizen of the United Kingdom, and thus is a citizen or subject of a foreign state for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a)(2). Knott is a citizen of the United Kingdom, and thus is a citizen or subject of a foreign state for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a)(2). Lothian, a corporation organized under the laws of Scotland, United Kingdom, with its principal place of business in the United Kingdom, is a resident of the United Kingdom and thus a citizen of a foreign state for

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                     March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.*, Case No. 3:16-cv-0267 JWS        Page 3 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 3 of 47

purposes of diversity jurisdiction under 28 U.S.C. § 1332(a)(2) and 28 U.S.C. § 1332(c)(1). GE, a corporation organized under the laws of Scotland, United Kingdom, with its principal place of business in the United Kingdom, is a resident of the United Kingdom and thus a citizen of a foreign state for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a)(2) and 28 U.S.C. § 1332(c)(1). The amount in controversy between NordAq and each of the Defendants is in excess of $75,000.

7.     Venue in this action is appropriate in the District of Alaska under 28 U.S.C. § 1391(b)(2).

## ALLEGATIONS COMMON TO ALL COUNTS

8.     Defendant Devine served as Chief Financial Officer ("CFO") of NordAq from January 2011 to August 2013 and as Chief Executive Officer ("CEO") of NordAq from September 2013 to July 2015. Devine served as a member of NordAq's Board of Directors from April 2011 to June 2015. As CFO/CEO and a member of the Board of Directors of NordAq, Devine had influence over other NordAq Board members and also members of NordAq management, which he used to execute and conceal his schemes and activities, as set forth in this action.

9.     Knott is the sole shareholder of Lothian. Knott is the managing and controlling executive officer of Lothian.

10.     Knott is President and sole shareholder of GE. Knott is the managing and controlling executive officer of GE.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

## DEVINE'S MISAPPROPRIATION AND MISUSE OF
## CORPORATE ASSETS, OPPORTUNITIES AND FUNDS
## FOR PERSONAL GAIN, AND OVERALL SCHEME
## TO DEFRAUD NORDAQ

### SUMMARY OF MISAPPROPRIATIONS, MISCONDUCT,
### AND SCHEMES TO DEFRAUD NORDAQ

11.     Over the course of 2011 to 2015, Devine, acting alone or in certain instances in concert with other parties, and in certain instances aided and abbetted by other parties, misappropriated more than $6,500,000 in cash from, and engaged in the unauthorized and fraudulent conveyance or transfer of substantial non-cash assets of NordAq through a wide-ranging fraud using various methods and schemes.   In addition, Devine breached his fiduciary duties to NordAq in multiple other ways.   Certain of Devine's methods and means of breaching his fiduciary duties and defrauding NordAq are summarized in paragraphs 11.1 through 11.5 below.

11.1.   From 2011 to 2015, Devine engaged in an extensive and frequent pattern of direct theft of substantial sums of cash from NordAq bank accounts.

11.2.   From 2011 to 2015, Devine made unauthorized use of NordAq monies and/or Company shares and/or warrants to pay third parties, with the express or implicit understanding and agreement that those third parties would transfer, convey, and/or provide, or had already transferred, conveyed, or provided, personal benefit and/or gain to Devine.   The gain that Devine received and/or planned to receive took the form of both monies, property, and/or benefits outside of NordAq and also, in some instances, as set forth below, took the form of promised continued position, employment, and compensation within and from NordAq.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

11.3.   The Devine third-party payments using NordAq's monies or assets to promote Devine's personal interests and personal business opportunities included, among other things, unauthorized and fraudulent payments of NordAq monies to Mr. Johnathon Edward Aitken Kidd ("Kidd") and Kidd's friends and relatives. Kidd was founder and Chairman of the Board for NordAq from January 2009 to June 2015, and served as consultant to NordAq from January 2011 to June 2015.  Devine has a long-time personal relationship with Kidd and his family.

11.4.   The Devine third-party payments using NordAq's monies or assets, included, among other things, unauthorized agreements entered into with, the conveyance of NordAq assets to, and the unauthorized issuance of warrants to purchase equity securities of NordAq to, Lothian and Knott and Knott's wife and business partners.

11.5.   The Devine third-party payments using NordAq's monies or assets to promote Devine's personal interests and personal business opportunities included, among other things, the theft and unauthorized and fraudulent payment of enormous sums of NordAq monies to and for the benefit of more than fifty of Devine's friends and relatives, by purchasing homes for them, paying for their personal vacations, paying for their college tuition, and paying many of their personal expenses.

12.   Devine's breaches of fiduciary duty, misappropriations, and actions to defraud NordAq also included, among other things, the activities summarized in paragraphs 12.1 through 12.10 below.

12.1.   Devine executed, on behalf of the Company, a consulting contract or agreement with Kidd through a company named Clearview Management, Inc.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

("Clearview"). Clearview is a company controlled and owned by Devine. He then caused NordAq to pay sums of money for Kidd's services far in excess of the contracted terms directly to Devine's personal bank account. However, on information and belief, Devine did not remit to Kidd all of the funds that he received from NordAq related to Kidd's services. In this way, Devine used the consulting agreement with Clearview for Kidd's consulting services to disguise and hide payments of monies from NordAq to himself.

12.2. Although Devine was paid a salary through NordAq's payroll beginning in January 2012, he instructed NordAq finance personnel to wire into his personal bank account substantial sums of NordAq monies on a frequent but ad hoc basis ($5,287,000 from nearly 200 wire transfers from 2011-2015), as and when he desired such funds. Additionally, Devine personally collected NordAq monies approved for the payment of Kidd's consulting services to NordAq. Devine also charged substantial personal expenses on NordAq debit cards, without the knowledge or approval of the Company's Board of Directors or shareholders. Devine caused NordAq to maintain a "Due from Clearview" account in an attempt to reconcile the amount owed from Devine on a monthly basis; however, the convoluted way that Devine managed the Company's cash and the difficulty in getting proper documents approving various transactions made this reconciliation difficult and enabled Devine to take, or caused to be expended for his benefit, significantly more NordAq monies that he was actually due in compensation.

12.3. Devine presented false invoices from third parties for services never performed for the benefit of NordAq that resulted in the payment of substantial sums of monies from NordAq to Devine's friends and family.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                          March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS          Page 7 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 7 of 47

12.4. Devine fabricated or had others create purported NordAq Board documents appearing to represent evidence of NordAq's Board's approval of various bonuses for himself and Kidd, among other things, when in fact these issues were never presented to, or approved by, the NordAq Board. In many cases, purported NordAq Board minutes or resolutions were created a year or more after the supposed meetings took place, and were created only after NordAq's auditors requested evidence that appropriate approvals had been given for certain transactions. In these cases, Devine was creating false audit evidence for the purpose of obtaining an unqualified audit opinion—one that would have been based upon false and fraudulent information.

12.5. In other cases, Devine fabricated or had others create purported NordAq Board documents appearing to represent evidence of NordAq's Board's consideration and approval of loan and contract transactions with Knott and Lothian. In these cases, once again, Devine had purported NordAq Board minutes or resolutions created after the supposed meetings took place to serve as false evidence representing that the transactions with Knott and Lothian had been noticed to and then considered and approved by NordAq's Board. At one point, Devine falsely informed NordAq's legal counsel that he had given notice of the alleged Board meeting by telephone, when no such notice had been given and no such meeting had been held.

12.6. Devine acted in concert, agreed with, and was aided and abetted by Knott, acting for himself and for Lothian, to have Devine commit NordAq to acquire and transfer valuable oil and gas leases in Alaska to a corporation owned and controlled by Knott (a company that Knott later formed as GE) in violation of NordAq's preexisting and

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

outstanding loan and security agreements with CIRI Energy, LLC ("CIRI"). Devine was fully aware of NordAq's preexisting and outstanding loan and security agreements with CIRI that were created and existing by virtue of a certain Note Purchase Agreement and a Pledge and Security Agreement, both dated August 3, 2012, and Devine imparted this information to Knott and/or Knott himself became aware of CIRI's security agreements and liens. Pursuant to the August 3, 2012, Pledge and Security Agreement, NordAq had granted to CIRI security interests in virtually all of NordAq's personal property assets, both then owned and after acquired, including its oil and gas leases. CIRI's security agreements were recorded in public records with the State of Alaska, Department of Natural Resources ("ADNR") and/or the United States, Bureau of Land Management ("BLM"), and thus Knott was on constructive notice as a matter of law of CIRI's prior security interests. CIRI is referenced as a creditor of NordAq in § 6 of the Third Loan Agreement, dated February 10, 2014, that was executed by Devine for NordAq and Knott for Lothian.

12.7. In several cases, Devine communicated with members of the Company's accounting staff, including by email, and instructed them to record as NordAq expenses payments from NordAq, which benefitted Devine or his friends and family and that provided no benefit whatsoever to NordAq.

12.8. Devine orchestrated the transfer of significant overriding royalty interests ("ORRIs") in the Company's leased acreage in Alaska to himself and other Company executives, without Board approval, and then transferred, and had the other executives transfer, these ORRIs to other parties, on information and belief, in return for payments directly to Devine.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

12.9.   Devine sold a significant portion of his shares in NordAq, in violation of his fiduciary duties as the CEO and as a Board member of the Company, at many times when the Company was actively raising funds for its operations.  In doing so, he created a private market for shares to benefit only himself, and deprived the Company of potential investors that it was actively pursuing to finance Company projects.

12.10. In 2011, NordAq did not have a payroll; all employees were paid as consultants.  Devine was paid during this time from a Chase account by a NordAq Director, Hugh North ("North"), who was residing in the United Kingdom.  Devine never informed North that Devine was being paid through NordAq's payroll starting in January 2012, and Devine continued to receive his consultant pay, in addition to his salary, for over two years.  As CFO of the Company during this time, Devine was in charge of the financials of the Company, and therefore the issue of Devine's compensation; more specifically, his overcompensation was never raised to the attention of NordAq's Board of Directors or shareholders.

## SPECIFIC MISAPPROPRIATIONS, MISCONDUCT, AND SCHEMES TO DEFRAUD NORDAQ

13.      Between 2011 and 2015, Devine was paid an annual salary of $300,000; however, in addition to the $1,330,443 that he received via the NordAq payroll (over $50,000 of which constituted a bonus that was not properly approved by the Board), Devine paid himself or caused NordAq employees to pay him the following extraordinary sums of NordAq monies: $4,597,545 in Wells Fargo wire transfers, $689,000 in Chase wire transfers, $413,577 in expenses for himself or Kidd paid on company debit cards, and

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                    March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS                Page 10 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 10 of 47

$10,574 for his personal American Express credit card account. In addition, Devine authorized over $500,000 in fringe benefits for himself and Kidd that were not approved by the NordAq Board or documented in any agreement. Devine also authorized, and in many cases disguised as NordAq expenses, over $1,300,000 in payments to third parties that benefitted Devine and his friends and family, but that provided no value to NordAq. Additionally, Devine used Company debit cards to purchase over $265,000 of airline tickets for over fifty of his friends and acquaintances who had no connection to NordAq. The total payments to Devine and for the sole benefit of Devine and his friends and family between 2011 and 2015 exceeded $9,000,000. Certain of Devine's methods for misappropriation of Company monies or assets are set forth in the examples below.

14.     On September 1, 2011, Devine instructed NordAq to wire him $148,000, purported to be used in part to make a loan of $58,000 to Faith Warthen ("Warthen"), who was the wife of a Company executive. Devine instructed that the $58,000 be recorded as a loan receivable by NordAq from Warthen. Later, on April 12, 2013, Warthen requested wire transfer information for NordAq to pay back the loan, but subsequently was instructed by Devine to send the funds to Devine rather than NordAq. Devine wired NordAq $50,000 on April 19, 2013, but he did not notify NordAq that these funds related to Warthen, instead recording the transfer of funds as a reduction in the amount due from Clearview (*i.e.*, Devine). Devine then instructed NordAq employees to cause NordAq to write the Warthen loan off as part of the Company's 2013 audit.

15.     Devine caused to be wired $1,200,000 from NordAq to his personal bank account on September 16, 2014, which he claimed represented a $600,000 bonus for

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                              March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.*, Case No. 3:16-cv-0267 JWS          Page 11 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 11 of 47

Devine and a $600,000 bonus for Kidd. These bonuses were not approved by the NordAq Board, and on information and belief, the $600,000 for Kidd was kept by Devine and not transferred to Kidd. From this unauthorized payment, Devine immediately disbursed $1,052,714 to various parties, including $945,000 that was wired on September 16, 2014, to complete his purchase of a private residence in Driftwood, Texas, for an individual named Cheryl White (a person who was not then and is not now affiliated with NordAq in any way); $5,000 that was wired on September 16, 2014, for a cashier's check required to purchase furniture and lawn equipment on the Driftwood, Texas, property; $6,109 wired on September 17, 2014, to pay tuition for the daughter of an individual named Rebecca Detrick (a person who was not then and who is not now affiliated with NordAq in any way); and $96,605 that was wired on September 22, 2014, to pay a confession of judgment that Devine had personally signed related to another property that he had purchased with NordAq funds, which served as the residence of Rebecca Detrick.

16.     Devine caused to be wired $350,000 from NordAq to his personal bank account on December 1, 2014, for the stated purpose of paying cash fees to an individual named Kenneth David Stevenson ("Stevenson"), who had a relationship with Devine, related to a $10 million loan that Stevenson helped arrange on behalf of the Company in October 2014 (Stevenson also received 278,750 in NordAq warrants for his fundraising success on behalf of the Company and was transferred 250,000 of Kidd's shares, on information and belief, in exchange for benefits enjoyed only by Devine and not the Company). On December 1, 2014, the same day NordAq wired Devine $350,000, purportedly for Stevenson, Devine wired $330,550 to pay for another private residence in

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Auburn, Alabama, that he purchased for an individual named Donna Kress (an individual who was not then and is not now affiliated with NordAq in any way). Subsequently, Devine instructed NordAq employees to send a separate transfer of $300,000 on December 3, 2014, to an entity called EAS Advisors (for whom Stevenson was working) for the same services. Email evidence shows that Stevenson was compensated from this $300,000 payment.

17. Devine made $413,577 in unauthorized personal expenses that he charged directly to NordAq debit cards, including $39,897 to Auburn University to pay the tuition for the daughter of Donna Kress (an individual who was not then and is not now affiliated with NordAq in any way); $9,874 to Tiffany's for a personal gift for one of his family or friends; $32,311 to a concierge/limo service in London, England, for services delivered to himself and/or one or more of his family or friends; $55,751 to AT&T for personal cell phones (belonging to himself and non-NordAq employees) separate from his NordAq cell phone; $36,311 to Hilton for personal hotel stays; $18,614 to U.S. Bank for an Audi automobile either for himself or one of his family or friends; $17,548 to Intercontinental Hotel for personal hotel stays; $14,303 to another limo service for services delivered to himself and/or one of his family or friends; and $165,795 to 122 additional separate vendors for personal expenses unrelated to NordAq business. *See* the attached Exhibit A for a detailed spreadsheet of personal expenses by vendor and category. None of the above-stated expenses were related to NordAq business or were of any benefit to NordAq.

18. Between 2011 and 2015, Devine made or authorized payments to others for his personal benefit that were either recorded as NordAq expenses or in the "Due from

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS
March 6, 2017
Page 13 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 13 of 47

Clearview" account in NordAq's books and records, totaling in excess of $1,300,000. These expenses include $84,000 to a horse-breeding company owned by Kidd's assistant/associate; $7,311 to pay the landlord of Stevenson; $3,525 and $4,578 for collectible fountain pens for Devine; $5,119 for payment on Devine's personal mortgage; $7,500 to pay Kidd's personal tour fees in Taiwan; $12,000 to pay an attorney for Devine's mother's estate; $16,088 for a golf outing for Kidd's daughter; $24,000 in support payments to Kidd's ex-wife; $33,408 to Andrew Fraser, the boyfriend of Devine's daughter; $45,000 in support payments to Kidd's son; $50,000 in support payments to Kidd's daughter; $60,000 to Kidd's cousin for unspecified consulting services, on information and belief never provided to NordAq, and/or which had no value or benefit to NordAq; $69,744 for real property title searches that were of no benefit or value to NordAq; $2,974 for a credit card unrelated to NordAq; $144,470 to Swiss Finanz (of which Devine owns 49 percent); $125,000 for a debt of Devine's former employer that he personally assumed; $185,409 for a downpayment on a residence in Puyallup, Washington, which bore no relation to NordAq's business; $196,472 to pay off a personal loan of Devine; and $260,000 in escrow payments related to Devine's former employer. None of these payments were for services or goods that provided any benefit to NordAq.

19.     Total payments from NordAq to Kidd's friends and family, made or authorized by Devine, totaled $263,000, but there is no evidence that any of them had any contract with NordAq or provided any services of value to NordAq. These payments include $20,000 to Lord Maxwell Beaverbrook ("Beaverbrook," Kidd's cousin) on September 12, 2012; $25,000 to Beaverbrook on December 5, 2012; $10,000 to Jack Kidd

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                                 March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS                        Page 14 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 14 of 47

(Kidd's son) on November 12, 2013; $25,000 to Jodie Kidd (Kidd's daughter) on December 18, 2013; $25,000 to Jack Kidd on December 18, 2013; $15,000 to Beaverbrook on December 31, 2013; $25,000 to Jodie Kidd on February 14, 2014; $10,000 to Jack Kidd on February 25, 2014; $24,000 to Wendy Kidd (Kidd's ex-wife) on August 6, 2014; and $84,000 to ATSBA Canada (owned by Cynthia Swensen, Kidd's assistant/associate) in twenty-three payments from July 2013 to May 2015.

20.     NordAq paid a total of $69,744 to Vellum LLC, authorized by Devine for title searches, including $19,375 on April 22, 2014; $14,345 on June 2, 2014; $18,250 on Feburary 25, 2015; and $17,774 on March 16, 2015.  These title searches on NordAq's lease properties were used to understand the ORRI position on these assets.  ORRIs were issued to NordAq executives, including Devine, and most were subseqently transferred to others.  Vellum's services benefitted the executives and the transferrees, not NordAq.

21.     NordAq made payments to Mr. Ernst Reutimann that Devine caused to be recorded as "Capital Raising Costs," including $50,000 on January 19, 2012; $20,000 on August 9, 2012; and $55,000 on September 18, 2014.  These payments were for a loan that Mr. Reutimann made to Perftech, Inc. ("Perftech"), Devine's former employer, which Devine had personally assumed.  These payments were of no benefit to NordAq.

22.     On October 17, 2012, NordAq wired $185,409 to National Title Company for a residence in Puyallup, Washington.  This residence was purchased in Devine's name and was the residence of an individual named Rebecca Detrick (a person who was not then and is not now affiliated with NordAq in any way).  The amount was posted to NordAq's "Due from Clearview" account and was supposed to be repaid by Devine within days, but

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                    March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS        Page 15 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 15 of 47

the check Devine sent to NordAq on October 19, 2012, was rejected due to nonsufficent funds. Devine paid $75,000 to NordAq on October 26, 2012, but the balance of $110,409 remains unpaid. In addition, Devine signed a confession of judgment in the amount of $96,605 for work done on this property, which he paid from the $1.2 million "bonus" he received in September 2014. In total, Devine caused NordAq to fund a net amount of $207,214 for a property that was of no benefit to it and which Devine sold on February 2, 2015, for $610,000. Per the settlement statement evidencing Devine's sale of this property, Devine received $109,638 from the sale. None of these funds were returned to NordAq.

23.     NordAq made several payments to the law firm Jermain, Dunnagan & Owens ("JDO") and JDO Trust that Devine instructed NordAq's finance department via email to record as "Legal Fees," specifically:  $97,000 on May 7, 2014; $50,000 on June 9, 2014; and $49,418 on July 28, 2014. JDO represented Michael Williams, who loaned $200,000 to Devine personally in September 2012 and was legally pursuing Devine for nonpayment of this loan. These payments were of no benefit to NordAq.

24.     Devine paid or caused to be paid funds to Perftech, which provided no service to NordAq. NordAq wired Devine $85,000 on January 18, 2012, and Devine sent $80,000 to Perftech on that same date. In September 2012, Eider LLC ("Eider") (a company 100 percent owned by Devine) sent Perftech $550,000, of which NordAq paid $260,000 with a wire to an escrow account related to a Perftech settlement agreement. Coincidentally, Kidd approved a bonus for Devine of $150,000, paid on August 30, 2012, which, on information and belief, was for the sole purpose of allowing Devine to send these funds to Perftech. On January 4, 2013, NordAq wired Devine $50,000, and on January 7, 2013,

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                                     March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS                      Page 16 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 16 of 47

Eider sent $50,000 to Perftech. On May 13, 2013, NordAq wired $32,000 to Devine, and on that same day, Eider sent $25,000 to Perftech. On July 12, 2013, NordAq wired $32,000 to Devine, and on that same day, Eider sent Perftech $25,000. Between August 7 and August 27, 2013, NordAq wired $84,500 to Devine, and on August 27, 2013, Eider sent Perftech $25,000.

25.     NordAq made payments to Swiss Finanz (Marcel Riedel ("Riedel")), which were recorded as "Capital Raising Costs": $12,000 on July 24, 2012; $9,000 on September 17, 2012; $15,000 on October 26, 2012; $8,000 on December 21, 2012; $7,900 on February 12, 2013; $7,400 on March 7, 2013; $7,680 on April 30, 2013; $7,750 on June 7, 2013; $7,240 on August 5, 2013; $7,500 on November 14, 2013; $15,000 on January 28, 2014; $20,000 on January 7, 2015; and $20,000 on March 26, 2015. There is no evidence that Riedel introduced any investors that purchased shares from NordAq. Moreover, Devine was a 49 percent owner in Swiss Finanz, and there is evidence that Riedel was active in seeking investors who made personal loans to Devine and were subsequently granted shares of NordAq or transferred shares of NordAq by Devine. The personal loans to Devine, including $200,000 from Urs Klingler, $100,000 from Jacquelin Kubli, and $55,000 from Swiss Finanz itself, were secured with NordAq shares and royalties from NordAq's development.

26.     Riedel and Swiss Finanz were also active in seeking investors to purchase Devine and Kidd's personal NordAq shares, with a total of 147 transfers/sales of shares by Devine and Kidd between March 2013 and May 2016. Neither management nor NordAq's Board was ever made aware of the specifics of these transactions. Riedel also found a

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                        March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS          Page 17 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 17 of 47

buyer for certain of the Company's ORRI interests in May 2015, but this transaction was never discussed or authorized by the NordAq Board. Nor was the transfer of a one percent ORRI in certain NordAq lease assets to NordAq executives, including Devine and Kidd, in June 2015.

27.     NordAq made payments to Andrew Fraser, boyfriend of Devine's daughter, in the amounts of $16,408 on September 8, 2014; $8,500 on December 17, 2014; and $8,500 on December 29, 2014. The only description of services on Fraser's invoices are "Support to Chairman When in UK" or "1 Month UK Support." Fraser provided no services to NordAq.

28.     Between 2011 and 2015, Devine made or authorized payments of fringe benefits to himself and Kidd in excess of $500,000. NordAq was not obligated to pay any of these benefits, and these benefits were not authorized by the Board. These personal expenses paid by NordAq include $221,691 for two apartments in London for Kidd; $107,717 for Devine's Anchorage apartment; $78,467 for Kidd's health insurance (which far exceeded the value of premiums paid by NordAq for other NordAq employees under the Company's health insurance plan); $57,130 for two Audi leases; $18,023 for personal auto insurance; $11,765 for Kidd's phone and internet in Canada; and $9,645 to Perftech for reimbursement of payments made by Perftech for Devine's personal automobile.

29.     Between 2011 and 2015, Devine made or authorized payments for personal flights for at least fifty friends and family members on NordAq debit cards in an amount exceeding $265,000. *See* attached Exhibit B, listing personal flights paid for by NordAq. These flights offered no benefit to NordAq. Devine also charged flights for himself

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                    March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS        Page 18 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 18 of 47

exceeding $630,000, and flights for Kidd exceeding $200,000, which, upon information and belief, include personal flights of no benefit to NordAq.

30.    Devine continuously transferred or sold his personal NordAq shares from March 2013 through May 2016.   Under the terms of the Subscription Agreement of NordAq's largest investor, that investor was entitled to a right of first refusal on any sales of shares, and Devine and Kidd were restricted to selling or transferring a maximum of 20 percent of their personal holdings.  Devine sold or transferred 232,669 shares, of which NordAq was never given any details.    However, NordAq has learned that Devine transferred 38,461 shares to Rolf Ehlers on April 15, 2011, to repay a loan of $250,000, and subsequently appears to have settled interest on that loan with cash and shares, but there is no record of this transfer in NordAq's books.   NordAq has also learned that Devine sold 10,000 shares to Michael Poujol ("Poujol") on May 10, 2013, which Poujol thought were newly issued shares based on Devine's representations, and another 10,000 shares to Poujol on August 25, 2013, where Devine again suggested to Poujol that he was buying new shares, not Devine's shares.  Poujol was an investor willing to invest in NordAq, but Devine instead sold his own shares (for which he paid nothing) and kept the money at a time when NordAq was actively seeking to sell new shares.

31.    Devine appears to have made personal investments using NordAq funds.  On November 20, 2012, Devine invested approximately $48,000 in Blue Ensign Technologies Limited.  NordAq wired Devine $140,000 from November 15-27, 2012.  On November 4, 2014, Devine invested $25,000 in Drink This LLC.  This was less than two months after Devine received the $1.2 million "bonus" from NordAq documented in paragraph 22.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                                    March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS                        Page 19 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 19 of 47

## LOTHIAN INVESTMENT PARTNERS LIMITED
## AND ANDREW ALLISTER KNOTT

32.     In or before 2013, Knott came to Alaska in search of acquiring interests in North Slope oil and gas leases. However, Knott was not, and none of his various companies were, qualified with either the Alaska Department of Natural Resources ("ADNR") or the Bureau of Land Management ("BLM") to bid on or acquire such Alaska oil and gas leases. The United States and the State of Alaska own land on Alaska's North Slope. Leases for oil and gas that are located below the surface of federal and state lands on Alaska's North Slope are acquired through an application and bidding process through the ADNR (state land) and/or the BLM (federal land). Devine and Knott had conversations and communications about potential development partnerships between Knott and/or his companies and NordAq involving NordAq's existing leases, the Tulimaniq leases on the Alaska North Slope, and also non-Alaska leases in which Knott had an interest. But, none of these conversations between Devine and Knott led to or resulted in an agreement, partnership, or joint venture between NordAq and Knott or his companies.

33.     Devine knew, and Knott was aware, that NordAq had acquired leases on the Alaska North Slope, the Tulimaniq leases. Devine knew, and Knott was aware, that NordAq had signed security agreements with CIRI granting CIRI security interests in all of NordAq's assets, both then presently owned and after-acquired. CIRI had recorded its security interests consistent with Alaska law against NordAq's property and after-acquired property consistent with Alaska law, and thereby perfected its liens under Alaska law against NordAq's property and after acquired property. CIRI's liens were priority liens

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                      March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.*, Case No. 3:16-cv-0267 JWS          Page 20 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 20 of 47

against NordAq's property and after-acquired property under Alaska law, and by way of CIRI's recording of its security interests, Knott was constructively aware of CIRI's security interests and the priority of those interests and that they would attach to any new leases that NordAq might acquire. Knott knew, or should have known, and/or was on constructive notice of the fact that CIRI's preexisting and outstanding security agreements would attach in a priority position to any oil and gas leases that NordAq would acquire in the future.

34. In late 2013, Knott and Devine once again spoke regarding Knott's desire to acquire certain new oil and gas leases located on the Alaska North Slope from the BLM and the ADNR. But, in 2013, Knott and his companies still did not qualify with the ADNR and/or the BLM to apply and/or bid for Alaska North Slope oil and gas leases. NordAq, however, already owned Alaska oil and gas leases, the Tulimaniq leases, and qualified to apply and bid for new Alaska North Slope oil and gas leases. Knott proposed to Devine and the two agreed upon a plan by which Devine would commit NordAq to work with Knott and one or more of Knott's companies, at Knott's choosing, to acquire new specifically identified North Slope oil and gas leases. By this plan, Knott and Devine agreed that NordAq would use its geologists, technical resources, and personnel to identify and bid on the lease prospects and use NordAq's status as a qualified bidder in the BLM/ADNR auctions, while Knott individually, and/or through one or more of his companies, would (a) loan funds to NordAq to make application and pay the required 20 percent downpayment to BLM and/or ADNR that was required in order to bid for the specifically identified Alaska North Slope oil and gas leases; (b) loan NordAq the funds needed to pay the balance of the purchase price for the leases; and (c) loan NordAq the

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS
March 6, 2017
Page 21 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 21 of 47

funds needed to pay the first year's rents on the leases. Devine and Knott understood that payment in full of the following three things, (i) the deposits on the leases, (ii) the balances of the purchase prices for the leases, and (iii) the first-year rental payments on the leases, were conditions precedent to NordAq being able to acquire the desired leases from the ADNR and BLM and thereafter transfer the leases into the new company that Knott agreed to form and qualify with ADNR and BLM.

35.    Knott and Devine agreed that if NordAq was successful in applying and/or bidding on the specifically identified Alaska North Slope oil and gas leases, using the loaned funds from Knott individually and/or from one of his companies, then Knott would form a new company, and work to promptly register and qualify that new company with ADNR and BLM so that it could receive transfer of and hold the leases. Despite their knowledge, real or constructive, of the CIRI security interests that would attach to leases acquired by NordAq, Devine and Knott agreed that Knott or one of his companies, including, but not limited to, the newly formed company, would have a call option to have the leases, once acquired, conveyed to the new holding company in exchange for extinguishment of the NordAq loans (which had been used to bid on, acquire, purchase, and maintain the leases so that they could ultimately be transferred to the new company), plus a 30 percent interest in the new company. This new holding company, which Knott eventually formed as GE, upon the exercise of the call option, was to be 70 percent owned by Knott and/or one of his companies, in recognition of the fact that Knott and/or his companies would have funded the purchase and maintenance of the specifically identified oil and gas leases. Devine and Knott agreed that NordAq would receive and retain a

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                           March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS          Page 22 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 22 of 47

30 percent interest in the newly formed company (GE), in recognition of its contribution to the transaction, that contribution being (a) the identification of the lease prospects and the technical and geological support used in such identification, and (b) lending its qualification to bid on and complete the acquisition and purchase of the leases in the BLM/ADNR auctions.

36.    Devine and Knott agreed that if Knott and/or his companies elected not to exercise the call option for the transfer of the oil and gas leases once they were acquired, then Nordaq would retain the leases, but would return Knott's and/or his companies' funding via the repayment of the loans. The intention of the parties was that the newly formed company (GE) would be formed and qualified as soon as practical and the option to convey the leases from NordAq into the newly formed company would be made immediately. In recognition that the acquisition of the leases, and thus the payment of all funds necessary to acquire the leases, were a condition precedent to the call option, Devine and Knott agreed that Knott's call option could be exercised only within 120 days after the newly formed company (GE) had been incorporated and registered with the BLM and ADNR and thus was in a position to receive transfer of the leases.

37.    Devine and Knott agreed and executed, and Devine executed for NordAq, without notice or authority from NordAq's Board of Directors, a series of agreements to memorialize and carry out the overall plan and transaction described in paragraphs 32-35 above. On November 1, 2013 Devine, Kidd and Knott executed a Memorandum of Understanding ("MOU") memorializing the understanding and agreement that they were entering into a "transaction" in which Knott and/or any of Knott's associates or connected

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS          Page 23 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 23 of 47

persons incorporated or organized or resident in a jurisdiction of Knott's choosing, all of whom and which were referred to as "AK" in the MOU, would "participate and assist in procuring funding for the exploration for and extraction of oil and gas from the areas in Alaska's North Slope governed by the oil and gas leases listed on the Schedule created contemporaneously and attached thereto, specifically the Grey Owl and Castle leases. The MOU plainly states the understanding between Devine and Knott that they were entering NordAq and Knott and the affiliated companies of Knott's choosing into a transaction whereby (a) NordAq would contribute its qualifications to bid on, acquire and temporarily own the specifically identified Grey Owl and Castle Alaska oil and gas leases; (b) Knott and/or his affiliated companies would contribute the money necessary to pay the acquisition and maintenance costs associated with acquiring the specifically identified Grey Owl and Castle Alaska oil and gas leases; (c) Knott would form the new company (GE) into which NordAq would transfer the specifically identified Grey Owl and Castle Alaska oil and gas leases after acquisition; (d) GE would pay NordAq the balance due under the loans from Knott and/or his affiliated companies to finance the acquisition and maintenance of the specifically identified Grey Owl and Castle Alaska oil and gas leases— effectively extinguishing NordAq's loan obligations; (e) GE would pay the maintenance and development costs associated with maintaining and developing the specifically identified Grey Owl and Castle Alaska oil and gas leases; and (f) Knott and GE would transfer to NordAq stock in GE equal to a 30 percent equity share in the company.

38.     As a condition of Knott and/or his affiliated companies contributing the funds to NordAq to make the bids on the leases for the benefit of Knott and his companies, Knott

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                          March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS          Page 24 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 24 of 47

required Devine and another NordAq Board member, Kidd, to sign personal guarantees to secure the debt that would exist during the period of time that the leases were held by NordAq prior to transfer to the new company (GE). On information and belief, Devine provided said guarantee to Knott and his affiliated companies with the understanding that Knott and/or his affiliated companies, including perhaps the new holding company to be formed by Knott for the purpose of receiving the oil and gas leases (GE), would provide personal benefit to Devine. At the time that the transaction with Knott and his companies was first initiated, Devine caused Company employees to issue 200,000 options to Devine, representing approximately 3 percent of the total underlying common shares of the Company then outstanding. And, after Devine left NordAq, he accepted a position with the new company formed to hold the oil and gas leases (GE), a position that Knott offered him.

39. The MOU referenced a Loan Agreement between Knott and NordAq, which was also dated November 1, 2013, to cover the cost of the deposits that had to be paid to the ADNR and the BLM in order to submit bids on the specifically identified Grey Owl and Castle Alaska oil and gas leases. The First Loan Agreement was for $700,000, the amount that the parties then anticipated would be the cost of the deposits for the specifically identified leases. On January 24, 2014, this First Loan was increased by $169,000 to $869,200, in recognition that the required deposits on the leases would be $869,200. The parties and the MOU, however, anticipated additional loans. The $869,200 was not nearly sufficient to enable NordAq to acquire the leases. The initial loan totalling $869,200 was to cover only the twenty percent deposit required to bid on the leases. The Schedule

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint
*NordAq Energy v. Paul L. Devine e. al.*, Case No. 3:16-cv-0267 JWS
March 6, 2017
Page 25 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 25 of 47

attached to the MOU and the First Loan Agreement showed bid deposits totaling $871,700—consisting of $465,200 (Grey Owl) + $406,500 (Castle). The MOU and the First Loan Agreement spoke of how NordAq would (1) "transfer" the leases into a new company to be formed by Knott ("NewCo"), and (2) how, upon transfer, Knott or NewCo would pay NordAq the remaining unpaid balance of the borrowed funds (washing out the obligation) and also deliver to NordAq shares of stock equal to 30 percent equity in NewCo. However, the First Loan was substantially insufficient to acquire the leases (the total acquisition cost for the leases was $5,639,929.70). The Schedule attached to the MOU and the First Loan Agreement showed the total acquisition cost for the leases to be: $746,670 Grey Owl rentals + $465,200 Grey Owl deposits + $1,837,072.32 Grey Owl balances + $583,743 Castle rentals + $406,500 Castle deposits + $1,600,744.40 Castle balances = $5,639,929.70.

40.     The MOU contained a section entitled "Pre-Emption," which served the sole purpose of protecting Knott's interest in the leases. The Pre-Emption section reflected an understanding that there would be additional loans involved in the overall transaction, and that Knott and/or his affiliated companies would provide the additional funds necessary to acquire the specifically identified Grey Owl and Castle leases. The Pre-Emption provision was designed to protect Knott's intention and desire to own 70 percent of the specifically identified Grey Owl and Castle oil and gas leases through his ownership in the new company that he was to form, by giving him a right of first refusal to either loan or invest the additional money necessary to acquire the leases. Knott did not want NordAq to acquire the remaining needed funds from any other person or entity, and thereby risk losing his

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                      March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS                Page 26 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 26 of 47

intended and desired interest in the leases to that other person or entity. Notably, to the extent the leases have been transferred into the new company (GE), which they have, then the Pre-Emption provision of the MOU has served its sole purpose.

41.    The First Loan Agreement also contained requirements that were not possible to be performed. For example, the First Loan Agreement required NordAq to not encumber the leases after they were acquired and before they were transferred into the new company (GE). But, because of CIRI's perfected security interests in NordAq's property, including after acquired property, CIRI's security interests would encumber the leases the very moment that they were acquired by NordAq.

42.    NordAq received the $869,700 from Knott and paid the money to the ADNR and BLM as deposits on the leases, thus enabling NordAq to submit bids on the leases. NordAq was the successful bidder on the leases.

43.    Because NordAq was successful in bidding on the leases, Knott caused his affiliated company, Lothian, to lend NordAq the funds necessary to pay (a) the remaining balance of the purchase price (approximately $3.625 million); and (b) the first-year rents on the leases (approximately $1.3 million). Absent NordAq's payment of the entire amount—in excess of $5.6 million (including the deposits, the balances due for purchase, and the first year rents)—NordAq would not have been able to acquire the leases or transfer the leases to the newly formed company that Knott had agreed and promised to form (GE).

44.    On January 24, 2014, Knott and Devine, operating under the same understanding that had been set forth originally in the MOU and the First Loan Agreement, caused a Second Loan Agreement to be executed, this time between NordAq and Lothian.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                    March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS          Page 27 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 27 of 47

This Second Loan Agreement was but a continuation of the original plan that had been initiated by the MOU and the First Loan Agreement. The Second Loan Agreement was for $3.625 million and was for the expressly stated purpose of funding (a) NordAq's business expenses, and (b) the capital and operating expenses for its business "in each case relating to the oil and gas leases," meaning the specifically identified Grey Owl and Castle leases listed on the Schedule that was originally attached to the MOU and the First Loan Agreement. The Second Loan Agreement specifically limited NordAq's use of the funds to the Grey Owl and Castle leases that were to eventually be transferred into GE, with GE being owned 70/30 by NordAq and Knott and/or Knott's affiliated companies.

45. On February 10, 2014, Knott and Devine, operating under the same understanding that had been set forth originally in the MOU and the First Loan Agreement, caused a Third Loan Agreement to be executed, this time once again between NordAq and Lothian. This Third Loan Agreement was but a continuation of the original plan that had been initiated by the MOU and the First Loan Agreement. The Third Loan Agreement was for $1.3 million and was for the expressly stated purpose of funding "the acquisition and first year rent for the oil and gas leases listed in the Schedule," meaning the specifically identified Grey Owl and Castle leases listed on the Schedule that was originally attached to the MOU and the First Loan Agreement. The Third Loan Agreement specifically limited NordAq's use of the funds to the payment of the first year's rents due to the ADNR and the BLM for the Grey Owl and Castle leases that were to eventually be transferred into GE, with GE being owned 70/30 by NordAq and Knott and/or Knott's affiliated companies.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint
*NordAq Energy v. Paul L. Devine e. al.*, Case No. 3:16-cv-0267 JWS
March 6, 2017
Page 28 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 28 of 47

46. Knott, working with Devine, failed to form the new company (GE) into which the acquired leases were to be conveyed by NordAq prior to the date upon which the remaining 80 percent of the lease-acquisition costs were required to be paid. As a result, in order to protect and preserve his interest in the leases, Knott had Lothian make the additional loans to NordAq to cover the remaining lease-acquisition costs pending the formation and approval of the new holding company (GE). The call option had not yet been exercised as a result of Knott's failure to timely form and qualify that new company (GE)—because Knott had not timely formed or qualified the new company (GE) NordAq was unable to transfer or convey the leases into the approved new holding company (GE). All of the above was done with the understanding and agreement that the payments for lease acquisition and other costs were the obligation of Knott and/or his affiliated companies, including, but not limited to, Lothian and/or GE, and that the NordAq payments were made only as an accommodation to Knott and his affiliated companies pending the formation of the new company into which the leases were to be conveyed.

47. In violation of NordAq's Bylaws and controlling Delaware law, Devine never noticed, called, and/or held a meeting of NordAq's Board of Directors to consider and approve the proposed oil and gas lease-acquisition transaction with Knott and his affiliated companies, any of the loan transactions, or the option issuance to Devine. Devine had NordAq's legal counsel prepare purported Minutes of a meeting of NordAq's Board of Directors, a meeting that purportedly was noticed and held on October 31, 2013, for the purpose of considering and approving the transactions. But, Devine never caused any such meeting of NordAq's Board of Directors to be noticed and/or held consistent with

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS
March 6, 2017
Page 29 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 29 of 47

NordAq's Bylaws and/or controlling Delaware law. On November 1, 2013, when NordAq's legal counsel received an email communication from Knott's legal counsel inquiring whether the members of NordAq's Board of Directors had been given notice of the purported October 31, 2013, Board meeting, Devine wrote back to NordAq's legal counsel and falsely stated that he had given notice of the meeting "by telephone." In truth, Devine never gave notice to the NordAq Board members of any meeting in October or November 2013, including, but not limited to, any meeting related to Knott's proposal. The only Board member other than Devine who was aware of Devine's transaction with Knott, was Kidd. Devine and Knott did not constitute a quorum of the Board of NordAq. Both Devine and Kidd breached their fiduciary duties by entering NordAq into the transaction with Knott and eventually Lothian without Board approval. Regardless, as a sophisticated businessman, Knott knew that NordAq's Board members could not vote to acquire oil and gas leases at NordAq's expense, plus interest, and a potential $5 million penalty paid to Knott, for the primary benefit of Knott and his affiliated companies, without breaching the Board members' own fiduciary duties and other obligations to NordAq and its shareholders.

48.    The oil and gas leases contemplated by Devine and Lothian/Knott were awarded to NordAq in February 2014. Subsequently, Knott assigned the call option to a company that he incorporated, GE. Throughout this time, Devine and Knott knew that the oil and gas leases awarded to NordAq as part of the plan referenced above were subject to NordAq's preexisting loan and security agreements with CIRI and CIRI's loans. Knott did not get GE registered and qualified with ADNR and BLM until early 2016.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                    March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.*, Case No. 3:16-cv-0267 JWS          Page 30 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 30 of 47

49.     Because Knott did not timely form, register and qualify GE, NordAq was required to hold and maintain the Grey Owl and Castle leases through 2015 and into early 2016. Although Knott and his affiliated companies, including, but not limited to, GE, were supposed to bear the cost of maintaining the leases after acquisition, NordAq was required to pay the rents on the leases in 2015 in the approximate amount of $1.3 million .

50.     In January and February 2014, Devine caused NordAq to issue 238,750 warrants to Knott's wife and 132,916 warrants to Knott's business associates, named Azima Musayeva and Hayal Ahmadzada (collectively, the "Knott Warrants"). The Knott Warrants represented over 5 percent of the total underlying common shares of the Company then outstanding. In violation of NordAq's Bylaws and controlling Delaware law, Devine never noticed, called, and/or held a meeting of NordAq's Board of Directors to consider and approve the Knott Warrants. NordAq received no benefit from the issuance of the Knott Warrants. On information and belief, however, Devine and Knott agreed that Devine would receive a personal benefit from Knott, Lothian, and/or GE in consideration for the unauthorized issuances of the Knott Warrants.

51.     In July 2015, Devine resigned from his employment with NordAq. Soon after his resignation, Knott caused GE to engage Devine.

52.     On information and belief, GE became registered with the BLM and ADNR in late 2015 or early 2016. In about November 2015, Knott and his affiliated companies attempted to acquire and assume the CIRI loans outstanding with NordAq, including CIRI's liens on NordAq's oil and gas leases. Knott was unsuccessful in acquiring or assuming the CIRI loans and liens regarding NordAq, and the CIRI loans and liens were

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS          Page 31 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 31 of 47

acquired by and transferred to an entity known as Arulux Second S. ar. ("Arulux"). Knott had been aware of the CIRI loans to NordAq, the CIRI security interests in NordAq's assets and property, including NordAq's after acquired property, such as the Grey Owl and Castle leases, and the CIRI liens against the same property and leases, since before February, 2014 and perhaps also before November 2013.

53.     On or about January 7, 2016, Knott caused GE to issue notice to NordAq of its intention to exercise the call option. At the time that Knott caused GE to give this notice to NordAq, Knott knew that the leases were encumbered by the CIRI liens that had been transferred to Arulux. NordAq's then-President, Robert Warthen, confirmed, by a February 10, 2016, email to Knott and GE, that, consistent with the plan that Devine had developed and caused NordAq to consummate with Knott and eventually Lothian, NordAq had assigned the oil and gas leases to GE. NordAq assigned the leases to GE with the understanding and expectation that the Knott and Lothian loans used for lease acquisition would be extinguished, as agreed upon by the parties. Thereafter, GE informed NordAq of its intention to transfer to NordAq 240,000 fully paid, ordinary shares in the capital of GE. At present, Knott has still not caused GE to issue stock to NordAq, and the State of Alaska, Department of Commerce, Community, and Economic Development, Division of Corporations, still reflects that GE is 100 percent owned by Knott.

54.     After the conveyance of the leases to GE, Lothian and Knott devised, and are in the process of attempting to execute, a scheme to retain both the leases conveyed pursuant to the call option, as well as the payment of all of the loan amounts extended to purchase the leases (*i.e.*, Lothian's consideration under the original carry agreement),

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint
*NordAq Energy v. Paul L. Devine e. al.*, Case No. 3:16-cv-0267 JWS
March 6, 2017
Page 32 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 32 of 47

including the Lothian loans made so that Nordaq, as a qualified purchaser in the bid round, would accommodate GE's request that all the lease-acquisition costs, among other GE expenses, would be made prior to the respective deadlines for such payments, plus interest thereon. In effect, Knott and Lothian devised and acted in concert to seek, and they are seeking to achieve the absurd outcome where Nordaq would not only provide its agreed-upon services for Knott, Lothian, and GE, but it would also effectively finance and pay for Knott's full 70 percent equity interest in GE. And, Devine, Knott, and Lothian acted in concert to effectuate the transfer of the oil and gas leases to GE in violation of the CIRI/Arulux loan and security agreements and liens, and to leave NordAq subject to potential liability to Arulux.

**CAUSES OF ACTION AGAINST DEVINE**

**COUNT 1—CONVERSION**

55.    NordAq incorporates herein the allegations stated in paragraphs 11-54 above.

56.    Through his actions described in detail above, including, but not limited to, (a) transferring to and/or expending and/or utilizing NordAq funds and/or property for his own, his family members', and/or his personal friends' benefits, and/or in order to induce others to provide benefit or value to Devine; (b) transferring to and/or expending and/or utilizing NordAq funds and/or property for Kidd's own, his family members' and/or Kidd's personal friends' benefits, and/or in order to induce Kidd and others to provide benefit or value to Devine; and (c) usurping valuable corporate opportunities that rightfully belonged to NordAq, Devine committed conversion(s) of NordAq's monies, tangible and intangible property, and/or corporate opportunities.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

57.     As a direct and proximate result of Devine's conversion, NordAq has suffered damages, the exact amount and nature of which will be proven with particularity at trial.   NordAq did not discover or learn of Devine's conduct described above until September 2016.

58.     Devine is liable to NordAq for its damages incurred as referenced in paragraph 56 above.

59.     Devine's conduct, as described above, was willful, intentional, malicious, and outrageous, and he is therefore responsible to NordAq for punitive or exemplary damages in an amount to be determined at trial.

## COUNT 2—BREACH OF FIDUCIARY DUTY
### (Failure to Exercise Reasonable Care)

60.     NordAq incorporates herein the allegations stated in paragraphs 11-54 above.

61.     At all times pertinent to this Complaint, as an officer and Director of NordAq, Devine was a fiduciary to NordAq and owed NordAq fiduciary duties.

62.     Devine's fiduciary duties to NordAq required him to possess that degree of knowledge and to exercise that degree of care that an ordinary officer and director would have possessed and exercised on behalf of NordAq under like or similar circumstances.

63.     Devine's conduct, as described in paragraphs 11-54 above, including, but not limited to, his conduct with respect to Knott, Lothian, and CIRI/Arulux, breached Devine's fiduciary duty of care owed to NordAq.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

64.     As a direct and proximate result of Devine's breach of his fiduciary duty of care, NordAq has suffered damages, the exact amount and nature of which will be proven with particularity at trial.

### COUNT 3—BREACH OF FIDUCIARY DUTY
### (Failure to Disclose Material Information and to Maintain Loyalty to NordAq)

65.     NordAq incorporates herein the allegations stated in paragraphs 11-54 above.

66.     Devine's fiduciary duties to NordAq required him to disclose to NordAq, by and through its Board of Directors, all material information affecting NordAq's rights and interests, and to maintain loyalty to NordAq and to act in NordAq's best interests, without regard to his own personal interests, to the extent that those interests conflicted with NordAq's interests.

67.     Devine's conduct, as described in paragraphs 11-54 above, including, but not limited to, his conduct with respect to Knott, Lothian, and CIRI/Arulux, breached Devine's fiduciary duty of disclosure and loyalty owed to NordAq.

68.     As a direct and proximate result of Devine's breach of his fiduciary duty of disclosure and loyalty, NordAq has suffered damages, the exact amount and nature of which will be proven with particularity at trial.

### COUNT 4—FIDUCIARY FRAUD
### (Failure to Disclose Material Information)

69.     NordAq incorporates herein the allegations stated in paragraphs 11-54 above.

70.     Any failure by a fiduciary to disclose material information to the beneficiary of the fiduciary relationship constitutes fiduciary fraud. Devine's failure as a fiduciary to disclose material information to NordAq, as referenced above, including, but not limited

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

to, information regarding Knott, Lothian, and the potential and/or real conflict between the Knott and Lothian transaction and the CIRI/Arulux loan and security agreements and liens, constitutes fraud.

71.     NordAq relied to its detriment upon and acted against its own best interests, as a result of Devine's failure to provide material information to NordAq.

72.     As a direct and proximate result of NordAq's detrimental reliance, NordAq has suffered damages, the exact amount and nature of which will be proven with particularity at trial.

73.     Devine's conduct, as described above, was willful, intentional, malicious, and outrageous, and he is therefore responsible to NordAq for punitive or exemplary damages in an amount to be determined at trial.

## CAUSES OF ACTION AGAINST
## KNOTT, LOTHIAN, AND GOLDEN EAGLE

### COUNT 5—AIDING AND ABETTING DEVINE'S
### AND KIDD'S BREACH OF FIDUCIARY DUTIES
### (Against Knott and Lothian)

74.     NordAq incorporates herein the allegations stated in paragraphs 32-54 above.

75.     When Knott contacted Devine in or around 2013, and sought Devine's assistance, by and through NordAq, in obtaining oil and gas leases in Alaska, Knott had actual knowledge that Devine owed fiduciary and other duties and obligations to NordAq in connection with his employment at the Company and his position as a NordAq Board member, including duties of loyalty, good faith, care, and disclosure.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                              March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS                    Page 36 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 36 of 47

76.     Knott also had actual knowledge that Kidd owed fiduciary and other duties and obligations to NordAq in connection with his employment at the Company and his position as a NordAq Board member, including duties of loyalty, good faith, care, and disclosure.[1]

77.     Knott also had actual knowledge that NordAq's Board of Directors owed fiduciary and other obligations to the Company and its shareholders, including duties of loyalty and care.

78.     As described in paragraphs 32-54, Devine and Kidd breached their duties and obligations owed to NordAq and NordAq's shareholders by unilaterally entering into the agreements with Knott and Lothian and receiving the issuance of the Knott warrants as referenced in paragraph 50 above, without approval from NordAq's Board of Directors.

79.     To the extent Knott's and Lothian's unbelievably one-sided interpretation of the agreements is correct, which it is not, Knott had actual knowledge that execution of the agreements was a breach of both Devine's and Kidd's fiduciary and other obligations to NordAq.

80.     Further, Knott also had actual knowledge that Board approval of such a one-sided transaction would have been a violation NordAq's Board's fiduciary and other obligations to the Company and its shareholders. Knott's interpretation of the transaction and the agreements associated with it does not lend itself to any conceivable rational

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

---

[1] NordAq has separately sued Kidd for breach of fiduciary and other obligations. *See* Case No. 3:17-cv-00031-JWS.

Second Amended Complaint                                                    March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS          Page 37 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 37 of 47

corporate purpose for NordAq. Further, under no circumstances could Knott's interpretation of the transaction and the agreements associated with it be described as entirely fair to the NordAq and its shareholders.

81.     Accordingly, Knott, acting individually and on behalf of Lothian, substantially assisted and encouraged Devine and Kidd to execute the transaction and the agreements associated with it despite knowing that execution of such an alleged one-sided agreement would constitute a breach of Devine's and Kidd's fiduciary and other obligations to NordAq.

82.     And, Knott, acting individually and on behalf of Lothian, conducted himself in ways that he believed substantially assisted and encouraged NordAq's Board of Directors to approve the agreements associated with it, despite knowing that Board approval of such an alleged one-sided transaction would constitute a breach of the Board's fiduciary and other obligations to NordAq and its shareholders.

83.     As a direct and proximate result of Knott's and Lothian's conduct, NordAq has suffered damages, the exact amount and nature of which will be proven with particularity at trial.

84.     Knott and Lothian are liable to NordAq for its damages incurred as referenced in paragraph 83 above.

85.     Knott's conduct individually and for Lothian, as described above, was willful, intentional, malicious, and outrageous, and Knott and Lothian are therefore responsible to NordAq for punitive or exemplary damages in an amount to be determined at trial.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                    March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS          Page 38 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 38 of 47

## COUNT 6—RESCISSION
### (Against Knott, Lothian, and Golden Eagle)

86.     NordAq incorporates herein the allegations stated in paragraphs 32-54 above.

87.     NordAq's Board of Directors never received notice of or approved the alleged agreements that were executed by Devine and Kidd.

88.     As described in paragraphs 32-54 above, when NordAq finally became aware of the agreements, NordAq had a completely different understanding of the terms of the agreements than did Knott, Lothian, and GE. Notably, NordAq's understanding is fair and equitable, whereas Knott, Lothian, and GE's understanding is irrational and unfair.

89.     Further, as described in paragraphs 32-54 above, the agreements were executed without NordAq's Board's approval as a result of the fraudulent conduct of Devine and Kidd.

90.     And, as described in paragraphs 32-54 above, as a result of the preexisting CIRI security interests, which Knott, Lothian, and Devine were all aware of, the agreements contained requirements that were impossible for NordAq to perform from the day the agreements were executed.

91.     Accordingly, the agreements between NordAq, Knott, Lothian, and GE, including, but not limited to, Devine's issuance of the Knott Warrants, as referenced in paragraph 50 above, should be rescinded as a result of the improper and/or fraudulent circumstances under which the agreements were executed, the Parties' mutually mistaken understanding of the material terms of the agreements, and the impossibility of performance under the agreements.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                                March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS                    Page 39 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 39 of 47

## COUNT 7—DECLARATORY RELIEF
## (Against Knott, Lothian, and Golden Eagle)

92.     NordAq incorporates herein the allegations stated in paragraphs 32-54 above.

93.     There exists an actual, real, and genuine dispute and controversy between NordAq and Lothian, Knott, and GE regarding the meaning and application of the NordAq-Knott Contract, executed by Devine and Kidd allegedly on behalf of NordAq.

94.     As a result of this actual, real, and genuine dispute and controversy between NordAq and Lothian, Knott, and GE, pursuant to 28 U.S.C. §§ 2201, 2202, NordAq is entitled to a declaratory judgment from the Court declaring its rights and obligations, if any, as to Lothian, Knott, and GE, with respect to the transaction between NordAq, Knott, Lothian, and GE, and the agreements entered into in association with that transaction.

95.     As an alternative, if the Court does not rescind the transaction and the agreements associated with it, then NordAq asks the Court to declare that (a) there was one overall transaction and contractual agreement between NordAq and Knott and Lothian related to the acquisition of the Grey Owl and Castle oil and gas leases; (b) the one overall transaction between NordAq and Knott and Lothian related to the acquisition of the Grey Owl and Castle oil and gas leases, involved (i) NordAq providing its qualifications and technical expertise in being able to bid on and acquire oil and gas leases in Alaska and in knowing which leases would be the best to acquire; and (ii) Knott and Lothian providing the money necessary to finance the complete acquisition and maintenance costs associated with the Grey Owl and Castle leases; (c) Knott was to form GE and register and qualify it with the ADNR and the BLM in a prompt manner in 2014 so that NordAq could transfer

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                      March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS        Page 40 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 40 of 47

the leases acquired into GE; (d) upon transfer of the leases into GE, Knott was to cause GE to pay to NordAq the remaining outstanding balances of the loans from Knott and Lothian to NordAq, so as to in effect wash out the loan obligations from NordAq to Knott and Lothian under the First, Second, and Third Loan Agreements; (e) after GE received transfer of the leases, GE was to be owned 70/30 by NordAq and Knott or Knott and any combination of his affiliated individuals or companies; (f) GE was to assume all costs associated with the maintenance of the leases after they were acquired by the bid in 2014; (g) the Pre-Emption set forth in the MOU was intended to protect and does protect only Knott's right of first refusal to invest in and/or lend money to NordAq only with respect to the acquisition and maintenance of the Grey Owl and Castle leases acquired as part of the transaction and the agreements associated with it; and (h) the amount stated as being due under the Pre-Emption is an unlawful and unenforceable penalty. NordAq also asks that the Court declare the Knott Warrants void.

## COUNT 8—REFORMATION
### (Against Knott, Lothian, and Golden Eagle)

96.　　NordAq incorporates herein the allegations stated in paragraphs 32-54 above.

97.　　NordAq's Board of Directors never received notice of or approved the alleged agreements that were executed by Devine and Kidd.

98.　　As described in paragraphs 32-54 above, when NordAq finally became aware of the agreements, NordAq had a completely different understanding of the terms of the agreements than did Knott, Lothian, and GE. Notably, NordAq's understanding is fair and equitable, whereas Knott, Lothian, and GE's understanding is irrational and unfair.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS
March 6, 2017
Page 41 of 47
Case 3:16-cv-00267-SLG　Document 23　Filed 03/06/17　Page 41 of 47

99. Further, as described in paragraphs 32-54 above, the agreements were executed without NordAq's Board's approval as a result of the fraudulent conduct of Devine and Kidd.

100. And, as described in paragraphs 32-54 above, as a result of the preexisting CIRI security interests, which Knott, Lothian, and Devine were all aware of, the agreements contained requirements that were impossible for NordAq to perform from the day the agreements were executed.

101. Thus to the extent the Court does not order rescission of the transaction and the agreements associated with it, and the Court disagrees with NordAq's understanding of the circumstances underlying the transaction and NordAq's interpretation of the language of the agreements , the Court should order the reformation of the agreements in a manner that effectuates NordAq's more objectively reasonable, equitable, and rational understanding of the transaction and the agreements associated with it.

## COUNT 9—BREACH OF CONTRACT
### (Against Knott, Lothian, and Golden Eagle)

102. NordAq incorporates herein the allegations stated in paragraphs 32-54 above.

103. Assuming the Court denies NordAq's request for rescission, but either interprets or reforms the agreements between NordAq and Knott/Lothian in a manner consistent with NordAq's reasonable understanding of the transaction and the agreements associated with it, then NordAq has performed all of its obligations thereunder.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

104.     Conversely, Knott and Lothian breached the agreements between NordAq and Knott/Lothian by failing to form GE within a reasonable amount of time after NordAq acquired the leases.

105.     Additionally, Knott, Lothian, and Golden Eagle breached the agreements by failing to pay NordAq in an amount equal to NordAq's then outstanding loan balances held by Knott and Lothian.  Indeed, as described in the MOU, such payments were intended to extinguish NordAq's outstanding debt to Knott and Lothian in exchange for NordAq's transfer of the leases to GE.  NordAq transferred the leases to GE, but has received no payment from Lothian, Knott, and/or GE in return, and Knott and Lothian continue to demand payment of the loans and interest thereon.

106.     Also, Knott, Lothian, and Golden Eagle breached the agreements by failing to transfer to NordAq a 30 percent ownership interest in GE following NordAq's transfer of the leases to GE.

107.     As a direct and proximate result of Lothian's, Knott's, and GE's breaches of contract, NordAq has suffered damages, the exact amount and nature of which will be proven with particularity at trial.

### COUNT 10—BREACH OF THE COVENANT
### OF GOOD FAITH AND FAIR DEALING
### (Against Knott, Lothian, and Golden Eagle)

108.     NordAq incorporates herein the allegations stated in paragraphs 32-54 above.

109.     The agreements associated with the transaction at issue in this action each contain an implied covenant that the contracting parties would act in good faith toward each other and would deal with each other fairly in all matters related to the contracts.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                    March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS          Page 43 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 43 of 47

Lothian, Knott, and GE owe this duty of good faith and fair dealing to NordAq with respect to the transaction and the agreements associated with it and all matters related to the transaction and contracts between NordAq, and Lothian, Knott, and GE.

110. Lothian, Knott, and GE breached their duties of good faith and fair dealing owed to NordAq by their actions referenced in paragraphs 32-54 and 103-107 above.

111. As a direct and proximate result of Lothian's, Knott's, and GE's breaches of the duty of good faith and fair dealing, NordAq has suffered damages, the exact amount and nature of which will be proven with particularity at trial.

## COUNT 12—UNFAIR TRADE PRACTICES ACT
## AS 45.50.471, *ET SEQ.*
### (Against Knott, Lothian, and Golden Eagle)

112. NordAq incorporates herein the allegations stated in paragraphs 32-54 and 103-107 above.

113. Knott, Lothian, and GE are engaged in trade or commerce in Alaska.

114. While engaging in trade or commerce in Alaska, Knott, Lothian, and GE committed unfair and/or deceptive acts or practices.

115. Specifically, Knott and/or Lothian wrongfully and in bad faith delayed forming GE so that NordAq would be required to pay substantial costs necessary to maintain the Leases that would ultimately be transferred to GE.

116. Additionally, Knott, Lothian, and/or GE accepted NordAq's transfer of the Leases to GE but wrongfully and in bad faith refused to pay NordAq the amounts due under the MOU in exchange for such transfers, and continue to demand that NordAq pay to Knott and Lothian the amounts for the loans, plus interest.

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint
*NordAq Energy v. Paul L. Devine e. al.*, Case No. 3:16-cv-0267 JWS
March 6, 2017
Page 44 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 44 of 47

117. Also, Knott, Lothian, and/or GE accepted NordAq's transfer of the Leases to GE but wrongfully and in bad faith refused to transfer a 30 percent ownership interest in GE to NordAq in exchange for such transfers.

118. Further, not only did Knott, Lothian, and/or GE wrongfully and in bad faith refuse to pay NordAq for the leases that were transferred to Golden Eagle, and refuse to transfer the requisite 30 percent ownership interest in GE to NordAq, Knott, Lothian, and/or GE then wrongfully and in bad faith demanded that NordAq also repay the outstanding loans, plus interest, and an additional $5 million illegal penalty.

119. Knott's, Lothian's, and/or GE's bad-faith actions violate Alaska's Unfair Trade Practices Act ("UTPA"), and have caused NordAq damages, the exact amount and nature of which will be proven with particularity at trial.

120. Pursuant to AS 45.50.531(a) and .537, NordAq is entitled to treble damages, plus its actual reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, NordAq prays for a trial by jury and that judgment be entered in its favor and against Devine, Knott, Lothian, and GE as follows:

1. For compensatory damages against Devine in an amount to be proven at trial, but in no event less than the jurisdictional limit of this Court;

2. For punitive or exemplary damages against Devine in an amount to be proven at trial;

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

3.      For rescission of the transaction and agreements and the Knott Warrants as described above between NordAq, Knott, Lothian, and GE and Knott's family and affilated persons;

4.      Alternatively, should the Court not rescind the agreements, for declaratory judgment against Lothian, Knott, and GE declaring NordAq's rights and obligations as to Lothian, Knott, and GE regarding the agreements wrongfully executed by Devine and Kidd without approval from NordAq's Board of Directors in a manner consistent with the objectively reasonable, equitable, and fair interpretation stated in paragraphs 32-54 and 95 above;

5.      Alternatively, should the Court not rescind the agreements or issue the requested declaratory relief, for reformation of the agreements consistent with NordAq's objectively reasonable, equitable, and fair interpretation, as described in more detail above;

6.      Should the Court either reform or declare the agreements to be consistent with NordAq's objectively reasonable, equitable, and fair interpretation, for consequential damages against Knott, Lothian, and GE in amounts to be proven at trial, but in no event less than the jurisdictional limit of this Court;

7.      For treble damages against Knott, Lothian, and GE, as provided for under Alaska's UTPA;

8.      For actual reasonable attorneys' fees and costs assessed against Knott, Lothian, and GE, as provided for under Alaska's UTPA;

9.      For other interest, costs, and attorneys' fees assessed against Devine as allowed by applicable law; and

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                    March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS                Page 46 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 46 of 47

10. For such other and further relief as the Court deems just and equitable.

DATED this 6th day of March, 2017.

BRENA, BELL & CLARKSON, P.C.
Attorneys for Plaintiff

By_____
Robin O. Brena, ABA No. 8410089
Kevin G. Clarkson, ABA No. 8511149
Matthew C. Clarkson, ABA No.1111077
Jon S. Wakeland, ABA No. 09110660

**Certificate of Service**
The undersigned hereby certifies
that on the 6th day of March, 2017,
a true and correct copy of the
foregoing was served by e-mail
upon:

**Attorneys for Andrew Knott and**
**Lothian Investment Partners**
Anne Marie Tavella, Esq.
Michael Jungreis, Esq.
Davis Wright Tremaine LLP
188 West Northern Lights Boulevard
Suite 1100
Anchorage, Alaska 99503
E-Mail:      annemarietavella@dwt.com
             michaeljungreis@dwt.com

_____
Avonna L. Murfitt

BRENA, BELL &
CLARKSON, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
Phone: (907) 258-2000
Facsimile: (907) 258-2001

Second Amended Complaint                                                    March 6, 2017
*NordAq Energy v. Paul L. Devine e. al.,* Case No. 3:16-cv-0267 JWS        Page 47 of 47
Case 3:16-cv-00267-SLG   Document 23   Filed 03/06/17   Page 47 of 47